CAPITOL HILL HOSPITAL, et al., Appellants,

v.

Anna L. JONES, Appellee.

No. 86-629.

District of Columbia Court of Appeals.

Argued April 28, 1987.
Decided Oct. 13, 1987.

* EDITOR'S NOTE: Associate Judges Nebeker, Newman and Ferren constituted the Division that originally considered the case. As noted in the penultimate paragraph of this Order, this Division has denied the motion to stay the mandate.

** Chief Judge Pryor, and Associate Judges Belson and Steadman are recused from consideration of this case.

† Associate Judge Nebeker did not vote on the motion for reconsideration as he regards the motion as one directed to the recused judges.

‡ Associate Judge Mack would grant the petition for rehearing en banc, but deny the motion for reconsideration of the denial of the petition.

Richard W. Boone, Washington, D.C., for appellants. Vicki J. Hunt, Arlington, Va., also entered an appearance for appellants.

William C. Burgy, with whom Karl N. Marshall and Kate S. Barfield, Washington, D.C., were on the brief for appellee.

Before MACK, FERREN and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

Appellants, Capitol Hill Hospital and Dr. Samuel Kleiman, appeal from an adverse medical malpractice jury verdict. Appellants' principal contentions, in the order presented to us, are 1) the verdict was coerced by the trial court's improper *Winters* charge; 2) the jury's award of $100,-000 solely for pain and suffering was excessive and based on insufficient evidence; and 3) the trial court improperly refused to apply the "locality" rule to determine the standard of care applicable to a physician serving as a "house officer" in a District of Columbia hospital. We affirm.

## I. *The Facts*

The decedent, Malachi Jones, was a terminally ill diabetic with numerous complications including loss of kidney function. He was admitted to Capitol Hill Hospital on September 28, 1985 for a sudden drop in blood pressure resulting from dialysis treatment. Upon his arrival, he was placed on supplemental oxygen administered through a nasal cannula by order of his primary physician, Dr. Hernandez. On the morning of October 11, 1985, without consulting any doctor, an unidentified hospital respiratory therapist reduced Jones' supplemental oxygen.[1] Early that evening, Jones complained of shortness of breath and was seen at approximately 6:30 P.M. by the "house officer," Dr. Kleiman.[2] Dr.

---

1. Appellee did not assert a separate claim of malpractice against the hospital for the morning reduction.

2. A "house officer" is a physician hired by the hospital to attend to problems beyond the competence of nurses and in the absence of the admitting or treating physicians.

Kleiman theorized that Jones' shortness of breath was due not from too little oxygen but paradoxically from too much. Therefore, the doctor decided to take Jones completely off supplemental oxygen for one hour to test his theory. He made this decision without consulting Dr. Hernandez. At 7:00 P.M., Dr. Kleiman went off duty. At approximately 7:30 P.M., supplemental oxygen was terminated by the hospital staff pursuant to Dr. Kleiman's order. Family members testified that during the period until Jones went into cardiac arrest at 8:15 P.M.,[3] Jones had substantial difficulty breathing and asked and reached for an oxygen mask which was lying on his bed.[4] Family members tried in vain to get the hospital staff to resume the supply of supplemental oxygen.

Decedent's wife brought suit against appellants. Her survival action[5] for Jones' pain and suffering during the 45 minute period between the termination of oxygen and cardiac arrest was submitted to the jury on the basis that Dr. Kleiman committed medical malpractice both in deciding to turn off the oxygen supplement and in making that decision in a non-emergency situation without consulting the patient's primary physician. The jury returned a verdict of $100,000.

## II. *The Winters Charge*

Appellants assert that the jury verdict was invalid because the trial court's jury instructions coerced a verdict. We review the totality of the circumstances to determine whether a verdict is the product of coercion. *Wilson v. United States,* 419 A.2d 353, 356 (D.C.1980).

In this case, the jury did have some difficulty reaching a verdict. After approximately two hours of deliberation, the jury sent out a note asking, in essence,[6] 1) what would happen in the event of a hung jury, and 2) for instructions on how to proceed if they found only one defendant negligent. The trial court reinstructed the jury on vicarious liability and reread Standardized Civil Jury Instructions for the District of Columbia, No. 1–4 (rev. ed. 1981), on the duty of the jurors to deliberate. Three and one half hours later the jury announced that it was deadlocked. Over appellants' objection, the trial court gave the jury the anti-deadlock *Winters* charge.[7] Less than one hour later, the jury foreperson announced that the jury had reached a unanimous verdict for appellee in the amount of $100,000. However, upon a poll of the jury, it was revealed that although the jurors were unanimous as to liability, they disagreed as to the amount and some jurors had not even decided upon any sum.[8] The court recognized that the jury apparently had not understood that they had to agree upon liability and the exact amount of damages for there to be a unanimous verdict; therefore, despite appellants' motion for a mistrial, the trial court instructed the jury[9] and asked them

---

**3.** The hospital staff made an unsuccessful effort to revive Jones. He was pronounced dead at 8:44 P.M. without having ever regained consciousness.

**4.** Because Jones was fearful of being taken off oxygen, Dr. Kleiman had ordered an oxygen mask be utilized as a placebo, although it would provide only the equivalent of room air.

**5.** Appellee's wrongful death and loss of consortium claims were dismissed prior to submission of the case to the jury. The survival of the decedent's right of action against appellants is provided by D.C.Code § 12–101 (1981).

**6.** The first jury note is not part of the record. The trial court summarized its contents at a bench conference with counsel.

**7.** *See* Standardized Civil Jury Instructions for the District of Columbia, No. 1–11 (rev. ed.

1981) (derived from the criminal instruction approved in *Winters v. United States,* 317 A.2d 530, 534 (D.C.1974)).

**8.** The jury poll revealed that six jurors had voted for $100,000, one for $75,000, three for $50,-000, and two had arrived at no amount.

**9.** The trial court's instructions at this point to the jury read in their entirety:

Ladies and gentlemen of the jury, the verdict must represent the considered judgment of each juror; in order to return a verdict, it is necessary that each juror agree to the verdict, both as to liability, if any, and amount of damage, if any. It is clear to me that the jury has not reached a unanimous verdict in that regard. So, I ask you please to return to the jury room to continue your deliberations. Thank you.

to resume their deliberations. The jury thereafter returned with unanimous agreement on the sum of $100,000.

■ Appellants first contend that the trial court in effect gave two *Winters* charges when it sent the jury back after the second note. While we have held in the criminal context that the giving of two "*Winters* instructions" crosses the line into the forbidden area of jury coercion, *Epperson v. United States*, 471 A.2d 1016 (D.C. 1984), even assuming that this holding applies in civil cases,[10] it is clear that this case is distinguishable. Here, the first note only requested instruction on the consequences of deadlock. The trial court took the jury at its word and did not give an anti-deadlock instruction at that time; rather it merely repeated the standard duty to deliberate instruction. After the second note, the trial court gave the only anti-deadlock instruction in this case, after which the jury reached unanimity on liability. The third episode was merely a clarification as to the need for unanimity on damages as well as liability.

■ Appellants further contend that even if there was no abuse of discretion in giving the *Winters* charge, the trial court coerced the jury when it sent the jury back after the jury poll revealed that the verdict was not unanimous on damages. For support, appellants cite *Thompson v. United States*, 354 A.2d 848, 850 (D.C.1976), for the proposition that at least in a criminal case, a trial court which has already given the *Winters* charge is "skating on thin ice"

if it sends the jury out another time after it receives a report that no verdict has been reached after a reasonable time. In *Thompson*, however, this court found no abuse of discretion. In this case we find even less reason to question the discretion of the trial court. In civil cases there can be a second trial on damages. In the totality of the circumstances, there was here no abuse of discretion in sending the jury back after it clearly expressed unanimity on liability, particularly when the non-unanimity on damages appears to have been a result of misunderstanding rather than dissention among the jury.[11]

### III. *The Damages Award*

■ Appellants contend that the damages award was not supported by sufficient evidence of conscious pain and suffering as a matter of law. To the contrary, under *Doe v. Binker*, 492 A.2d 857, 861 (D.C.1985), the existence of pain and suffering could be inferred from the circumstances surrounding the decedent's death, which in this case were sufficient to permit the jury to make reasonable inferences. Three family members testified about Jones' breathing difficulties, his concern over his condition, and his attempts to resort to a useless oxygen mask during the 45-minute period after the oxygen was turned off.[12]

Appellants also contend that even if appellee's pain and suffering evidence was sufficient to go to the jury, the damage award of $100,000 was so excessive "as to shock the conscience," requiring a new trial

---

**10.** One could argue that in a criminal case, where the coercive power of the state is focused upon an individual's liberty and the standard of guilt is beyond a reasonable doubt, courts should be particularly wary forcing a verdict. However, in the civil context, such concerns are not present and thus the standard for finding coercion arguably could be less stringent. We need take no position on this issue.

**11.** Once the jury was instructed to reach a unanimous amount, they were able to do so relatively quickly. Appellants also cite cases where trial courts have granted a new trial due to jury confusion. *See Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 175 (5th Cir.1975); *Fox v. United States*, 417 F.2d 84, 89 (5th Cir.1969). While it perhaps would have been within the discretion

of the court to order a mistrial, this case is well within the range of civil cases where appellate courts have affirmed a decision of a trial court to reinstruct juries that are confused and having difficulty reaching a verdict. *See, e.g., Dickerson v. Pritchard*, 706 F.2d 256, 259 (8th Cir. 1983); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 506 (5th Cir.1984).

**12.** Jones' perception that his condition had worsened after the oxygen was disconnected and an inferable conscious awareness of impending death could be considered in the pain and suffering calculus. *See* 3 M. MINZER, J. NATES, C. KIMBALL, D. AXELROD & R. GOLDSTEIN (hereinafter M. MINZER) *et al., Damages in Tort Actions* § 21.11 [3][4] (1987).

or a substantial remittitur. *Davis v. Ab-buhl,* 461 A.2d 473, 475 n. 4 (D.C.1983) (citations omitted).[13] Appellants made a motion for a new trial or for remittitur which was denied by the trial court. We are particularly reluctant to substitute our judgment for that of the trial judge who was present at and observed the entirety of the four-day trial. We give his decision not to disturb the verdict substantial weight and will reverse only for an abuse of discretion.[14] *Id.,* 461 A.2d at 475; *see also* 2 S. SPEISER, *Recovery for Wrongful Death,* § 9:4 at 9–10 (2d ed. 1975); 1 M. MINZER, at § 1.32[1][a]. While the parties cite cases granting both higher or lower amounts for pain and suffering to bolster their contentions about this verdict, we have said that excessive verdicts should not be measured strictly on a comparative basis. Rather:

> Each case in this area necessarily rises or falls on its own facts and the trial court in ruling on the question of whether or not a jury verdict is excessive must determine on the totality of facts before it whether it was the result of passion, prejudice, or mistake.

*May Department Stores v. Devercelli,* 314 A.2d 767, 775 (D.C.1973). Therefore, while in the context of the cases cited to us, this verdict may have been at the high end of the permissible spectrum, our review of the evidence in the record does not show that the trial court abused its discretion denying appellants' motion for a new trial or for remittitur.

### IV. *Standard of Care*

At trial, appellee's sole expert witness was Dr. Kravis, a board certified family practice physician from Pennsylvania. Appellants first contend they were entitled to judgment because Dr. Kravis failed to establish the proper standard of care expected of Dr. Kleiman. They invoke the so-called "locality rule," by which the conduct of members of the medical profession is to be measured solely by the standard of conduct expected of other like members of the medical profession in the same locality or the same community, rather than a national standard. The trial court refused to give such a limiting instruction.

In *Morrison v. MacNamara,* 407 A.2d 555 (D.C.1979), we said that the "locality rule" has no relevance to medical practice in the District of Columbia. However, as that case dealt with a nationally certified medical laboratory, we only were called upon to rule at that time that a national standard of care applied "at least" to board certified physicians, hospitals, medical laboratories, and other health care providers. Appellant asserts that since there is no national certifying board of a specialty of "house officer" physician, the locality rule should be applied in this case.

■ The rationale of *Morrison,* however, applies with equal force to medical practice that does not fall under the aegis of a national certification scheme. As we stated in *Morrison:*

> [T]he nation's capital is not a community isolated from recent advances in the quality of care and treatment of patients. Rather, it is one of the leading medical centers in quality health care.... The hospitals in the District not only possess some of the most recent medical technology, but also attract some of the best medical talent from all over the country....
>
> Moreover, any purported disparity between the skills of practitioners in various urban centers has for the most part been eliminated. Unlike the diversified and often limited training that was available a hundred years ago, medical education has been standardized throughout the nation through a system of national accreditation.... In sum, the major underpinnings of the locality doctrine no

---

**13.** Alternatively, the standard has been articulated as being whether the verdict "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Phillips v. District of Columbia,* 458 A.2d 722, 724 (D.C.1983) (citations omitted).

**14.** The cases cited by appellants are not controlling. They all involve motions for remittitur granted by a trial court and affirmed by this court on appeal. *See, e.g., Davis v. Abbuhl, supra; Phillips v. District of Columbia, supra.*

longer obtain. The locality rule has been quite properly criticized as a relic of the nineteenth century which has no relevance to the realities of modern medical practice.

*Id.,* 407 A.2d at 562–63 (citations omitted). Under this broad holding, we find no persuasive reason to employ, as appellants urge, a separate locality rule with all its problems, turning upon the particular health care provider and the specific medical acts involved.[15] The subject physician in this case, Dr. Kleiman, attended medical school in the District and interned in California. He is board eligible in internal medicine and licensed in New York and Maryland as well as in the District. Under *Morrison,* persons seeking medical services in this jurisdiction have a right to expect physicians to engage in conduct that comports with national education, training, and standards in the full range of their practice.[16]

■ Appellants further argue that even if a national standard of care applies, appellee's expert failed as a matter of law to establish the national standard applicable here. Appellants' insistence that Dr. Kleiman's actions can only be characterized under the rubric of "house officer" misconceives the true nature of the issue. Dr.

Kleiman's actions affecting the decedent were those of a physician, not an administrator.[17] Upon review of the record, we think that Dr. Kravis had sufficient experience as a board certified family practice physician with over 20 years experience in private practice and in hospitals (at times as a house officer) to state his opinion as to the appropriate standard of care to be expected. The trial court submitted the standard of care issue to the jury without reference to the "house officer" status. The jury was informed that Dr. Kravis was qualified to testify as an expert in medicine and the jury instructions simply stated that Dr. Kleiman had to have acted with "that degree of skill, care and learning ordinarily possessed and used by members of his profession in the same line of practice, acting in the same or similar circumstances."[18] We find no error.[19]

*Affirmed.*

seen more generally as a question of proper medical conduct concerning changes in treatment by doctors who for any reason see the patient of another doctor in a non-emergency situation and believe a change of treatment would be beneficial. Phrased in this way, the question seems one quite basic to medical practice.

15. Appellants nevertheless contend that such a separate standard is necessary because in the absence of a national certifying board, the "house officer" is a hybrid administrative-medical position with responsibilities unique to each city. However, this may be, insofar as the house officer is acting in a medical capacity in treating patients, a national standard is appropriate. *See* discussion, *infra.*

16. Extending the application of a national standard of care to all physicians is not only appropriate given the characteristics of medical practice in the District of Columbia but in addition is in accord with the trend in a significant number of other jurisdictions. *See Shilkret v. Annapolis Emergency Hospital Ass'n,* 276 Md. 187, 198, 349 A.2d 245, 252 (1975); *Douglas v. Bussabarger,* 73 Wash.2d 476, 488–90, 438 P.2d 829, 837–38 (1968); *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968); *Blair v. Eblen,* 461 S.W.2d 370, 372–73 (Ky.1970); *Shier v. Freedman,* 58 Wis.2d 269, 206 N.W.2d 166 (1973).

17. As appellee argued at trial, Dr. Kleiman's failure to call Dr. Hernandez was not uniquely a function of his house officer status, but can be

18. Certainly appellants were free to argue to the jury that there is in fact no national standard in this area of physician consultation or that the standard was different from that enunciated by Dr. Kravis.

19. Appellants also assert that in any event, the failure by Dr. Kleiman to notify Dr. Hernandez (one of the two negligent acts relied on by appellee) was not shown to be the proximate cause of the decedent's injury. We cannot think that, as the case developed and was presented, the jury could have rested its decision on that ground alone rather than on Dr. Kleiman's act in turning off the oxygen supplement.