Charles TRAVERS, Appellant,

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 93–CV–1070.

District of Columbia Court of Appeals.

Submitted Dec. 19, 1994.

Decided March 4, 1996.

---

Clinton W. Chapman, Washington, DC, was on the brief for appellant.

Vanessa Ruiz, Corporation Counsel at the time the memorandum was filed in lieu of brief, and Charles L. Reischel, Deputy Corporation Counsel, and James C. McKay, Jr., Assistant Corporation Counsel, Washington, DC, were on the memorandum in lieu of brief for appellee.

Before WAGNER, Chief Judge, KING, Associate Judge, and GALLAGHER, Senior Judge.

Opinion for the court by Senior Judge GALLAGHER.

Dissenting opinion by Chief Judge WAGNER at p. 8.

GALLAGHER, Senior Judge:

Appellant commenced this medical malpractice suit alleging that the District of Columbia General Hospital's negligence led to the amputation of the front half of his right foot. After a mistrial due to a hung jury, the District of Columbia (the "District") filed a Motion for Entry of Judgment pursuant to Super.Ct.Civ.R. 50(b), claiming that appellant failed to prove the existence of a national standard of care and failed to show proximate cause. On July 19, 1993, the trial court granted the District's motion and entered judgment in favor of the District. Appellant appeals the trial court's ruling. We affirm.

## I.

Appellant was treated at D.C. General Hospital for traumatic injuries resulting from an automobile accident. Doctors performed a splenectomy [1] several days after the accident. After the splenectomy, appellant developed a blood clot above his right ankle which obstructed the flow of blood to his right foot. Gangrene developed in his foot

---

1. A splenectomy refers to the removal of the spleen.

and it was partially amputated. He later brought suit against the District for medical malpractice. In support, he alleged a failure to properly administer aspirin following the removal of his spleen permitted a blood clot to form in his ankle, causing gangrene and necessitating the amputation.

His claim of medical malpractice was based upon the contention that the failure of the hospital physician to give him aspirin after the operation when his blood platelet level reached 800,000 to 1,000,000 constituted negligence. This negligence, says appellant, caused the injury.

Plaintiff offered a medical expert witness to establish that aspirin should be administered to prevent a clot in a post-splenectomy patient; and that the surgeon who performed this operation on plaintiff breached the applicable standard. The specific issue being addressed was whether the surgeon had delayed too long in administering aspirin as an anti-platelet therapy, the purpose being to ward off the formation of blood clots. While aspirin was in fact administered the claim was that it was done too late.

The plaintiff introduced a medical expert witness in an effort to establish that (a) a national standard of care exists as to when aspirin should be administered to avoid a clot in a post-splenectomy patient, and (b) here the surgeon breached that standard. The defendant's position was, and is here, that the plaintiff failed to establish a national standard of care in support of his position. The issue is whether the trial court erred in granting the defendant's motion for judgment on the basis that the plaintiff had failed (a) to effectively establish the national standard of care in these circumstances, and (b) to show the failure to administer aspirin was proximate cause of the injury suffered due to a deviation from the standard, each showing being required to establish medical malpractice. *Allen v. Hill,* 626 A.2d 875, 877 (D.C. 1993).

## II.

■ There was a hung jury and the trial court then granted a motion for judgment, filed pursuant to Super.Ct.Civ.R. 50(b) after a mistrial was declared. We review the grant of judgment in the light most favorable to the appellant. *See, e.g., Spain v. McNeal,* 337 A.2d 507, 508–09 (D.C.1975).

■ In a medical malpractice action, the plaintiff must prove the applicable standard of care, deviation from that standard and a causal relationship between the deviation and the injury. *See, e.g., Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C. 1990). In this jurisdiction, the applicable standard is a national standard, not just a local custom. *See id.* (citing *Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C.1979)). In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (footnote omitted). "The purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation. The sufficiency of the foundation of those opinions should be measured with this purpose in mind." *Washington Hosp. Ctr., supra,* 579 A.2d at 181 (citations omitted).

■ The personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care. Thus, in *Meek, supra,* 484 A.2d at 581, the court ruled a doctor's testimony insufficient where he never testified to a standard of care, "but rather stated only what he would do under similar circumstances" to those at issue. Similarly, in *Toy v. District of Columbia,* 549 A.2d 1, 8–9 (D.C.1988), the expert, although indicating that he had reviewed certain publications before testifying, insufficiently based his opinion as to the necessity of certain devices solely on his experience in a single jurisdiction.

■ There must be, then, evidence that a particular course of treatment is followed nationally. Reference to a published standard, though not required, can be important in determining whether a national standard's adherence was proven with sufficiency. *See*

*Morrison, supra,* 407 A.2d at 562–63 (availability of publications important to national standards requirement). Further, if there was evidence that the witness had discussed the described course of treatment with practitioners outside the District, such as at seminars or conventions, and that those other practitioners agreed with the course urged, the testimony might have been sufficiently supported since it would have been based upon "adequate data." *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 367 (D.C.1980). Without such proof, there is no indication that the described standard is followed nationally, except the notion that what is done by certain District doctors is nationally followed because the District's doctors are required to adhere to national standards. But that is just another way of saying that the applicable standard is what the testifying expert would have performed, which we have deemed an inadequate showing. *See Meek, supra,* 484 A.2d at 581–82.

■ Essentially, appellant's medical expert witness testified that support for his opinion in relation to treatment by aspirin after the operation rested on discussions with about five or six local fellow surgeons.[2] He testified, "It is the consensus of opinion of all the surgeons with which I have worked with and taught with that we do use aspirin when it reaches about two times normal." He did not relate any basis for a further statement that other physicians around the country held the same viewpoint. He merely stated that he attended various medical conferences all over the country where doctors would discuss medical issues. The expert further admitted, however, that "I can't say indeed that we discussed this particular post splenectomized patient and whether or not we

should give aspirin in plate—we know we do."

Clearly, this does not show the existence of a national standard since the expert admitted that he may or may not have discussed this at various national conferences. Moreover, the .expert admitted that he discussed this medical issue with only five or six other general surgeons in the Washington metropolitan area. When asked on cross-examination the basis for his testimony that the national standard requires the giving of aspirin when the platelet count following a splenectomy reaches between 700,000 and 800,-000, the expert replied, "I said aspirin is indicated, and it is indicated." The expert was again asked whether "it was your testimony here today that [the giving of aspirin] is mandatory," to which the expert replied, "For me it is." Again, the expert expressed a personal opinion rather than a national standard of care.

Significantly, the expert was unable to specify any published medical standards, manuals, or protocols to support his opinion. Appellant provided only generalizations that were unsupported by any specific medical literature. On cross-examination the District asked, "But you can't show us that [giving aspirin is a usual and customary practice] in any literature or in any hospital protocol, it's only your personal opinion, isn't it?" The expert then replied, "No, it's not my only personal opinion. General surgeons generally do this." The expert further testified, "the majority of surgeons would have institute[d] [aspirin] at that phase, and that is indeed my opinion and that is indeed what most of the doctors that I've talked to ... do use."[3] Finally, when asked whether he could point to a journal, textbook, or medical

---

2. Appellant's medical expert received medical training at Howard University where he also completed his residency. The expert practiced in the District as a general surgeon, and maintained privileges at Hadley Memorial Hospital, Howard University Hospital, and D.C. General Hospital. He had trained interns and residents in surgery at D.C. General Hospital. Although the medical expert was licensed to practice medicine in Maryland, he had never actually done so. The only evidence that the expert had been exposed to the practice of medicine outside the District was his six-month employment with the Department of Defense in 1961 as a "civilian

officer" at Fort Meade in Maryland. At the trial, the expert testified that splenectomy was not part of his own surgical practice and that he "thinks" he had performed one in the last ten years.

3. The expert testified that "I have not talked to anyone other than the [doctors] in the Washington metropolitan area.... I ... am familiar that our practice ... is no different from any other practice in the country...." The expert, however, failed to explain the basis for this general assertion other than his conversations with five or six local surgeons.

periodical, where this national practice was part of a hospital protocol, the expert stated, "Nor am I going to try." The expert failed to provide any factual basis for his assertion that his testimony reflected a national standard other than his conversations with five or six colleagues within the District.[4]

Thus, appellant failed to establish a national medical standard in support of his position relating to the administration of aspirin after a splenectomy. This was fatal to his case because, to prevail here, he was required to establish that there was deviation from a national standard of care.

### III.

■ Appellant also failed to show that the conduct of the attending physician was the proximate cause of his injury. In order to establish proximate cause, "[t]he expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986). The expert, however, recognized that it could not be determined in what part of the body the offending arterial clot originated. He also acknowledged that the patient (appellant) suffered from pre-existing arteriosclerosis, which was a potential source of the blood clots which caused the gangrene, necessitating the amputation. Thus, there was no evidence to show that the blood clot formed subsequent to the splenectomy, nor was there any testimony that aspirin would have halted the migration of a pre-existing blood clot.

### IV.

Appellant failed (a) to establish that a national standard of care required a physician to administer aspirin to a post-splenectomy patient with a platelet level twice the normal, and (b) to present a *prima facie* case of

proximate cause. Accordingly, the decision of the trial court is

*Affirmed.*

WAGNER, Chief Judge, dissenting:

The testimony of appellant's medical expert was sufficient to allow him to have his case decided by a jury. *See Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990). Viewing the evidence in the light most favorable to appellant, as we must, appellant met his three-part burden of establishing the applicable standard of care, its breach by the physician who treated him, and a causal relationship between the breach and appellant's injury. *See id.; see also Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1255 (D.C.1991). Contrary to appellee's argument, the expert's opinion in this case was not based merely on his personal opinion, which would be insufficient. *See Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C.1988). Rather, the testimony of appellant's expert was based on the prevailing national standards for the practice, as an examination of the record will reveal.

Dr. Brownlee testified that it was his opinion that the failure to administer aspirin timely to appellant fell below the national standard of care. He testified that "it is the opinion of all general surgeons, that we give aspirin for [appellant's] condition to prevent the formation of thrombus and emboli." On this point, he further testified that "[i]t is the consensus of opinion of all of the surgeons with which I have worked [ ] and taught with that we do use aspirin when [the platelet count] reaches about two times the norm." He elaborated further "that the vast majority of surgeons that I am aware of, and I attend these meetings . . ., do use aspirin in post-splenectomized patients and particularly when the platelet level reaches a certain level, in terms of around two times the norm." At this point in the testimony, Dr. Brownlee was talking about the American College of Surgeons; therefore, it is reasonable to infer that he was making reference to

---

4. The dissenting opinion cites to the Framingham study relied on by the expert. This study, however, was done by cardiologists who gave aspirin to heart patients to prevent the extension

of myocardial infarction. The expert admitted, however, that the situation in this case "is an entirely different scenario."

their meetings. Dr. Brownlee also cited a Framingham study in support of his position. The Framingham study addressed specifically the administration of aspirin by cardiologists in relationship to thrombosis to prevent myocardial infarction, which Dr. Brownlee thought to be analogous.

Indeed, the treatment rendered by the District and the testimony of its expert are consistent with Dr. Brownlee's testimony in critical respects. The District's physicians and expert witness also found it was medically indicated to administer aspirin and that aspirin prevented blood clotting.[1] In concluding that the expert was expressing only his personal opinion concerning the need to administer aspirin, the majority seems to rely, in part, on the surgeon's statement on cross-examination that aspirin is "indicated." The term, "indication," in medicine means that "[i]n the course of a disease, a sign, symptom, or development [has occurred] which makes the use of a particular procedure or medicine advisable." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE (1992). Thus, the expert's use of the term in testimony does not render his opinion, that aspirin is "indicated" when the platelet count reaches between 700,000 and 800,000 following a splenectomy, a personal one.

In sustaining the rejection of the expert's opinion of the standard of care, the majority seems to read a requirement into *Morrison v. MacNamara,* 407 A.2d 555 (D.C.1979) that the expert must have spoken to other physicians in states which are not contiguous with the District of Columbia in order to testify regarding a national standard of care. *Morrison* stands for exactly the opposite proposition, *i.e.,* that physicians in the District are presumed to practice under a national standard of care because of "the tremendous resources available in the District for medical professionals [which] keep them abreast of advances in the care and treatment of patients that occur in all parts of the country."

407 A.2d at 565. In rejecting the locality rule in *Morrison,*[2] we observed that

> the nation's capital is not a community isolated from recent advances in the quality of care and treatment of patients. Rather, it is one of the leading medical centers in quality health care. The medical schools in the nation's capital rate as some of the most outstanding schools in the nation. The hospitals in the District not only possess some of the most recent medical technology, but also attract some of the best medical talent from all over the country.

*Id.* at 562. The clarity in the law which *Morrison* provided is blurred by the majority's rejection in this case of the testimony of a board-certified surgeon merely because it perceives that he has conferred about the issue involved with only five or six fellow surgeons in the metropolitan area. Moreover, there are "uniform standards of proficiency established by national board certification." *Id.* at 565; *Capitol Hill Hosp. v. Jones,* 532 A.2d 89, 93 (D.C.1987). For these reasons, I cannot agree that Dr. Brownlee's expert opinion on standard of care must be rejected because his medical experiences, with limited exceptions, have been within the District of Columbia, and his discussions about the medical issue involved in this case have been with general surgeons only in the Washington metropolitan area.

The majority also finds significant that the expert did not identify any "published medical standards, manuals or protocols" in support of his opinion.[3] Although the fact that scientific data has been published in a peer-reviewed journal may be relevant to the validity of a particular scientific technique on which an expert opinion is based, it is not mandatory that the expert base his or her opinion on published materials, as the majority concedes. This court never has excluded the opinion of a board-certified medical expert merely because he does not rely on a

1. However, appellee's expert contended that there was no firm national standard which dictated the platelet level at which aspirin must be administered.

2. "The locality rule states that the conduct of members of the medical profession is to be mea-

sured solely by the standard of conduct expected of other members of the medical profession in the same locality or the same community." *Morrison, supra,* 407 A.2d at 561 (citations omitted).

3. The expert did reference the Framingham study, in support of his position.

published treatise or other published authority for his opinion. The majority has not cited, and I have been unable to find, any courts which take such a restrictive view of the resources upon which experts in the field reasonably may rely. The Fifth Circuit has taken exactly the opposite position in holding that an expert cardiologist's "refus[al] to base his testimony on a single medical textbook or journal article does not warrant wholesale exclusion of this testimony." *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994). Indeed, the Supreme Court has recognized that "[p]ublication ... is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability ... and in some instances well-grounded but innovative theories will not have been published." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993) (citations omitted).[4]

An expert opinion must have a reliable basis; however, even in cases dealing with strictly scientific data, support in treatises is not an absolute requirement. This court has recognized that physicians acquire the knowledge they use in the profession from many sources, including their personal experiences and through others in related fields. *See Garvey v. O'Donoghue*, 530 A.2d 1141, 1147 (D.C.1987). The expert opinion of a physician should not be rejected merely because it is based upon long-term personal experiences and the experiences of other physicians.[5]

The trial court found that appellant's medical expert was qualified to render an opinion, a finding which the record fully supports. According to the evidence, Dr. Brownlee, a Diplomate of the American Board of Surgery (ABS) since 1964, with a specialty in general surgery, is licensed to practice in the District of Columbia and Maryland. He received ABS certification after successful completion of a four-year, post-degree training program and an oral and written examination. He was appointed medical officer for the District of Columbia General Hospital, where he served in the emergency and admissions departments. Later, he was promoted to Chief Medical Officer. In spite of the witness' education, training, and experience, the majority seems to suggest that the expert was not qualified to render an opinion with respect to the standard of care for post-splenectomy patients because Dr. Brownlee thought he had performed only one such operation in the last ten years.[6] However, Dr. Brownlee testified explicitly that removal of a spleen was within his medical specialty. He also testified that, as Chief of Surgery at Hadley Memorial Hospital, he reviewed all records of surgical procedures performed at the hospital, and therefore, he was familiar with what happens to post-splenectomy patients even though he did not perform personally the procedure involved. This background is more than adequate to meet the requirements to qualify the expert to render an opinion on the subject involved.[7] See *Jones, supra*, 532 A.2d at 94. Indeed, "'a physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks.'" *Melton, supra* note 5, 597 A.2d at 897 (quoting *Baerman v. Reisinger*, 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966)).

In reviewing an appeal from the granting of a motion for judgment notwithstanding the

---

**4.** In *Daubert, supra,* the Supreme Court considered the proper standard for admission of expert testimony under the Federal Rules of Evidence. 509 U.S. at ——, 113 S.Ct. at 2792. The court rejected the "general acceptance" test for admitting expert scientific evidence in light of the absence of such a requirement in the Rules and the liberal thrust of the Rules in relaxing the barriers to the admission of expert opinion evidence. *Id.*

**5.** Such a position would be contrary to the principle that the court should not substitute its judgment for the expert's as to the source of information upon which experts reasonably rely. *See In re Japanese Elec. Prods.*, 723 F.2d 238, 277 (3d Cir.1983). If of the type upon which experts reasonably rely in forming an opinion, further testing of the opinion should be left to rigorous cross-examination. *Id.; see also In re Melton,* 597 A.2d 892, 901 (D.C.1991); *Edwards v. United States,* 483 A.2d 682, 685 (D.C.1984).

**6.** See majority opinion, note 2.

**7.** "A person who by education, study, and experience has become an expert in any art, science, or profession, and who is called as a witness may give his opinion as to any such matter in which he is specially versed and which is material to the case." Standardized Civil Jury Instructions for the District of Columbia, No. 3–3 (Rev.1985).

verdict, this court is bound by the same constraints as the trial court. We must view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Washington Hosp. Ctr., supra,* 579 A.2d at 181; *Spain v. McNeal,* 337 A.2d 507, 508 (D.C.1975). Against this standard, it cannot be said that no reasonable juror could reach a verdict for appellant. *See Washington Hosp. Ctr.,* 579 A.2d at 181. The question is whether the expert's testimony and the evidence as a whole, along with reasonable inferences therefrom, would allow a reasonable juror to find that a reasonably prudent physician would have administered aspirin at a particular time during appellant's post-splenectomy treatment. *Id.* The expert's testimony, as previously described, demonstrates that we must answer this question in the affirmative.[8]

That an expert witness for the opposing party testifies that there is no national standard which requires the treatment outlined by the other party's expert is not a basis for taking the issue from the jury. That is a matter to be argued to the jury for their consideration in resolving the factual dispute between the experts. *See Jones, supra,* 532 A.2d at 94; *see also* Standardized Civil Jury Instruction for the District of Columbia, No. 9–6 (Rev.1985).[9] Here, the trial court accepted the witness' qualification as an expert in the field of general surgery. Viewing the evidence and reasonable inferences in the light most favorable to appellant, as we must,[10] it is clear that appellant's expert witness provided the jury with evidence of "the course of action that a reasonably prudent doctor with the defendant's [employee's] specialty would have taken under the same or similar circumstances." *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (citing *Morri-*

*son, supra,* 407 A.2d at 560–65); *Washington Hosp. Ctr., supra,* 579 A.2d at 181. The expert's opinion as to the national standard of care provided a sufficient foundation to create a jury issue and precluded the court from resolving it as a matter of law. *See Washington Hosp. Ctr., supra,* 579 A.2d at 181.

Contrary to appellee's argument, appellant also presented sufficient evidence on proximate cause to prevent the entry of judgment as a matter of law for appellee. To meet the burden of establishing proximate cause where expert medical testimony is required, "the expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries." *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986). Dr. Brownlee rendered such an opinion at trial. Dr. Brownlee testified that the administration of aspirin when appellant's platelet count fell below a certain level "to a reasonable degree of medical probability would have prevented the formation of the thrombos and embolization that caused the loss of a foot[,]" the condition for which appellant brought his action. He further testified that "[t]o a reasonable degree of medical certainty, if [appellant] had received aspirin at a level of which he was 2XN, that is twice his normal, his chances of emboli would have been darn near nil." Specifically, with respect to appellant, the doctor testified that the hospital administered aspirin, but it did so too late to prevent the clot which formed and migrated to his foot and caused a blockage which resulted in the amputation. He also testified that you can anticipate the problem when you fail to manage

---

8. Other similar testimony appears in the record.

9. Instruction No. 9–6 is designated "Standard of Care Determined by Expert Testimony." It provides in pertinent part as follows:
   You must determine the standard of professional learning, skill, and care required of the defendant only from the opinions of the [doctors] who have testified as expert witnesses as to such standard. You should consider each such opinion and should weigh the qualifications of the witness and the reasons given for his opinion.... You must resolve any conflict

in the testimony of the witnesses by weighing each of the opinions expressed against the others, taking into consideration the logic of the reasons given for the opinion, the facts relied upon by the witness ... his relative credibility, and his special knowledge, skill, experience, training and education.

10. *See Washington Hosp. Ctr., supra,* 579 A.2d at 181 (standard of review of judgment notwithstanding the verdict replicates that of the trial court).

the patient in conformity with the described standard of care. Thus, on this record, there was sufficient evidence from which "a reasonable juror could find that there was a direct and substantial causal relationship between the [appellee's] breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable." *Id.* For these reasons, I conclude that the trial court erred in entering judgment as a matter of law for appellees, and accordingly, I respectfully dissent from the opinion of the court.