Brendan F. BURKE, M.D., Appellant,

v.

Steven SCAGGS, et. al., Appellees.

No. 03–CV–188.

District of Columbia Court of Appeals.

Argued Oct. 19, 2004.
Decided Jan. 27, 2005.

Before TERRY, RUIZ and GLICKMAN, Associate Judges.

RUIZ, Associate Judge.

The legal issue presented in this matter is whether a plaintiff in a medical malpractice action fails to establish a prima facie case when his experts differ as to the applicable standard of care. We hold that a discrepancy between experts as to the standard of care will not defeat the plaintiff's prima facie case for malpractice. We further hold that by failing to request a special verdict form, the appellant has forfeited the right to assert that the individual jurors may have relied on different theories of liability in reaching their verdict for the plaintiff. We therefore affirm the judgment entered on the jury's verdict.

I.

This case resulted from injuries which occurred during the birth of appellees' daughter, Haley, on June 27, 1998. The appellant, Dr. Brendan F. Burke, was the attending obstetrician. During the birthing process, a condition known as "shoulder dystocia" presented itself. This condition occurs when the baby's anterior shoulder becomes stuck behind the mother's pubic bone after the head has been delivered. Mr. Scaggs, who was present for the delivery, testified that at the time this complication was discovered, a pall came upon the delivery room, and the situation became tense. Dr. Burke maintains that, upon discovering the complication, he applied "gentle traction" to Haley's head and shoulder area,[1] employed the "McRoberts maneuver,"[2] and then ap-

Alfred F. Belcuore for appellant.

Kim M. Keenan, with whom Jack H. Olender, Harlow R. Case and Karen E. Evans, Washington, were on the brief, for appellees.

1. Traction is defined as "the act of pulling or drawing, used as a corrective or therapeutic measure, or as a maneuver." 4 J.E. SCHMIDT, THE ATTORNEY'S DICTIONARY OF MEDICINE, T-136 (1991).

2. An expert testified at trial that in administering the McRoberts maneuver, "the pa-

tient's legs go back against her chest as far as you can and what it does, it doesn't make any more room in the bon[e]y pelvis, the bon[e]y pelvis is a given dimension, but it takes and lines up the forces so that the forces [are] single directional instead of going through—instead of going through the slope of the

plied suprapubic pressure to Mrs. Scaggs.[3]

Haley now suffers from severe brachial plexus injuries.[4] Haley has undergone a number of surgeries in an attempt to assuage the harsh effect of these injuries. Nevertheless, Haley remains physically handicapped for life, unable to supinate[5] her hand so as to undertake those little things in life which many take for granted: the ability to button one's own clothing, hold a cup, use a toothbrush, or tie one's shoes.

The Scaggs filed suit against Dr. Burke in 2000, alleging that he was negligent in delivering Haley. Although Dr. Burke was alleged to have been negligent in a number of ways, he challenges only the sufficiency of the expert testimony on whether his use of traction in delivering Haley fell below the applicable standard of care. In support of their claim that the doctor's use of traction was negligent, the Scaggs presented two expert witnesses to testify as to the applicable standard of care. The first, Dr. James Anderson, had been a board-certified practicing gynecologist and obstetrician for over a third of a century. Dr. Anderson testified that Dr. Burke had violated the standard of care "by not going through the proper maneuvers to disimpact the shoulder and by putting traction on the head." Dr. Anderson also maintained that "traction to disimpact the shoulder is below the standard of care.

It is not a maneuver to be used to resolve shoulder dystocia." Even though the medical records from the birth noted that only "gentle" traction had been employed, Dr. Anderson opined that "gentle traction becomes excessive in this kind of a setting without the obstetrician even realizing it. No traction is appropriate."

The plaintiffs' other expert witness as to the standard of care was Dr. James O'Leary, who is also board-certified in obstetrics and gynecology. Although he had retired from the active practice of medicine, Dr. O'Leary continued to teach obstetrics, and has published a book on shoulder dystocia. Dr. O'Leary was of the opinion that Haley's injuries were the result of "excessive traction or pulling on Haley's head after the head had been delivered and the shoulder was stuck." Dr. O'Leary was more permissive than Dr. Anderson as to the use of traction during delivery. He would allow gentle traction, but only after unsuccessful attempts to employ alternative maneuvers, and "only if you put the mother in the McRoberts position and somebody is pushing down above the pubic bone." Thus, he was of the opinion that gentle traction was sometimes permissible, but as a last option during the delivery and only when used in conjunction with other simultaneous procedures.

Appellant moved for judgment as a matter of law at the close of the appellees'

---

pelvis." Experts for both parties testified that the McRoberts maneuver is considered the preferred first response to shoulder dystocia.

3. Suprapubic pressure is, as its etymology suggests, pressure "situated, or performed, above the pubic bones or pubic arch." 3 SCHMIDT, *supra*, note 1, at S–279.

4. The brachial plexus is defined as "a large and important nerve structure situated partly in the neck and partly in the armpit ...." *See* 1 SCHMIDT, *supra* note 1, at B–118. It "descends in the lower part of the neck re-

gion know as the posterior triangle ..., and is placed above the clavicle and to the side and back of the sternocleidomastoid muscle ...." *Id.* Injuries to the brachial plexus may cause pain in the shoulder, arm, and hand regions, as well as the wasting of some of the arm muscles. *Id.*

5. To supinate, as applied to hands, is to rotate the right hand clockwise, or the left hand counterclockwise, as in tightening or unscrewing the lid of a jar. See 3 SCHMIDT, *supra*, note 1, at S–273.

case, claiming that the evidence as to the correct standard of care concerning the use of traction "[was] contradictory between the two expert witnesses." Specifically, appellant argued that because Dr. Anderson would never permit traction, and Dr. O'Leary would allow it in some circumstances, "the jury [was] going to be left with the need to speculate as to what is exactly the standard of care." The court denied the motion, ruling that "there is certainly enough in this case to let the jury have it." The jury ultimately returned a general verdict for the plaintiffs and awarded damages in the amount of $850,000.00.

## II.

### A.

Judgment as a matter of law is proper "[i]f during a trial by jury [the plaintiff] has been fully heard with respect to [a claim], and there is no legally sufficient evidentiary basis for a reasonable jury to have found" in the plaintiff's favor. Super. Ct. Civ. R. 50(a)(1); see also Abebe v. Benitez, 667 A.2d 834, 835–36 (D.C. 1995). Since the court is not the trier of fact in a jury trial, in deciding whether judgment is appropriate, the judge "must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury." Carter v. Hahn, 821 A.2d 890, 892 (D.C.2003) (quoting Abebe, 667 A.2d at 836 (internal quotations and citations omitted)). "Thus, '[a] verdict may be directed only if it is clear that the plaintiff has not established a prima facie case.'" Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1097 (D.C.1994) (quoting Clement v. Peoples Drug Store, Inc., 634 A.2d 425, 427 (D.C.1993)). "In reviewing a directed verdict, we 'view the facts, as the trial court was required to, in the light most favorable to the non-moving party.'" Id. (quoting

Washington v. A & H Garcias Trash Hauling Co., 584 A.2d 544, 545 (D.C. 1990)).

In a medical malpractice action, there are three elements a plaintiff must show to establish a prima facie case: "(1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury." Talley v. Varma, 689 A.2d 547, 552 (D.C.1997); see Meek v. Shepard, 484 A.2d 579, 581 (D.C.1984); Kosberg v. Washington Hosp. Ctr., Inc., 129 U.S.App. D.C. 322, 324, 394 F.2d 947, 949 (1968). The applicable standard must be nationally recognized. See Morrison v. MacNamara, 407 A.2d 555, 560 (D.C.1979) (rejecting the "locality rule," and requiring that a physician's actions be adjudged by a national standard of care). Establishing the standard of care is essential to a prima facie case of negligence because physicians are not expected to be perfect and "do not and cannot guarantee results," Meek, 484 A.2d at 581; they are liable in negligence only when their behavior falls below that which would be undertaken by a reasonably prudent physician, and there is a causal link between this behavior and the injury suffered.

### B.

Appellant argues that he was entitled to judgment as a matter of law at the end of the plaintiffs' case because their evidence was insufficient to present a prima facie case with respect to the applicable standard of care. Specifically, appellant contends that because plaintiffs' two experts disagreed on whether traction was ever a proper response to shoulder dystocia, they failed to present evidence of the applicable standard of care against which Dr. Burke's actions were to be assessed.

We disagree and conclude that the trial court did not err in denying the motion for judgment as a matter of law and permitting the entire case to go to the jury.[6] Even if we assume that Doctors O'Leary and Anderson opined as to differing standards of care,[7] it has long been recognized with respect to expert testimony—as with the testimony of other witnesses—that the assessment of credibility is for the jury, and "the jury may assign a preference to one item of testimony over the other . . . ." *Kosberg*, 129 U.S.App. D.C. at 325, 394 F.2d at 950. In *Kosberg*, the plaintiff's two expert witnesses in a medical malpractice action differed in their opinions as to what caused the decedent's death. *See id.* at 324, 394 F.2d at 949. The United States Court of Appeals for the District of Columbia Circuit reversed the trial court's grant of a directed verdict in favor of the defendants, holding that "conflicts in the testimony of witnesses, including expert witnesses, called by a party are not necessarily fatal to his case." *Id.* at 325, 394 F.2d at 950. *Kosberg* is binding precedent dispositive of the issue raised by the appellant in the instant case. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

■ If we were to address the issue anew, we would come to the same conclusion, and hold that different opinions of expert witnesses as to the standard of care presented by the plaintiff do not defeat a *prima facie* case and are properly submitted to a jury, just as differing opinions of experts by opposing parties are submitted

6. At trial, it was contended that Dr. Burke violated the applicable standard of care not only by applying excessive traction in the delivery, but also by failing to make an episiotomy (an incision to enlarge the birth canal), and, more importantly, by failing to attempt first to deliver the baby's hand, so as to allow additional room for the rest of her body. Doctors Anderson and O'Leary both agreed that the standard of care required that these other techniques be utilized before any traction was applied. Appellant does not take issue with this part of their testimony. Thus, even if we agreed with appellant that the discrepancy in the experts' testimony undermined appellees' *prima facie* case on the standard of care concerning the use of traction, he would not have been entitled to judgment, but only to have the case in chief limited to the other theories of liability. As it was not, the case presented to the jury was focused primarily on the use of traction, and the injuries that resulted from pulling on the baby's head and shoulder. Appellees do not argue, as they do with respect to appellant's argument concerning lack of unanimity, discussed *infra,* that by agreeing to a general verdict appellant has failed to preserve the argument that the evidence was insufficient to support a *prima facie* case. The trial judge was presented with, and ruled on, the motion for judgment with respect to the standard of care on the use of traction. Although it is theoretically possible that the general verdict could logically and properly rest on another theory of liability, we think that the manner in which this case was presented to the jury makes it likely that the verdict relied upon the primary theory presented, the misuse of traction.

7. Appellant maintains that the plaintiff submitted two "contradictory" standards of care to the jury: Dr. Anderson's, which maintained that any traction in this situation fell below the standard, and Dr. O'Leary's, which prohibited excessive traction, but would allow gentle traction only after all other options had been employed, and if the mother was properly positioned. The jury, however, could have found that these opinions were complementary, rather than contradictory. For example, the O'Leary standard prohibits any excessive traction, and Dr. Anderson is of the opinion that in this situation any traction was, by definition, excessive. Appellant did not dispute that he applied traction in delivering Haley; Dr. O'Leary was of the opinion that this traction was excessive and thus below the standard of care, and Dr. Anderson would concur that such application of traction, in these circumstances, was below the standard of care. Therefore, the opinions submitted by the appellees' experts are not so mutually exclusive that they must be considered "contradictory."

for the jury's evaluation.[8] Determining the applicable standard of care is a question of fact for the jury. *See Ray v. American Nat'l Red Cross*, 696 A.2d 399, 404 (D.C.1997) ("[T]he jury, informed by expert testimony where appropriate, determines what the applicable standard of care is in a particular case.") (citing *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 183 (D.C.1990)). In a medical malpractice action, because the requisite knowledge is often beyond the ken of laypersons, it must be proved through expert testimony. *See Meek*, 484 A.2d at 581; *see also* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS, 188 (5th ed. 1984) ("Since juries composed of laymen are normally incompetent to pass judgment on questions of medical science or technique, it has been held in the great majority of malpractice cases that there can be no finding of negligence in the absence of expert testimony to support it."). The function of an expert witness is to utilize his or her skill, knowledge, and expertise to render an opinion, and thus assist the trier of fact in reaching its conclusions about scientific, technical, or other specialized matters outside the knowledge of the average layperson. *See, e.g., Dyas v. United States*, 376 A.2d 827, 832 (D.C.1977); *see also* FED. R. EVID. 702 (allowing "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). In a medical malpractice case, the expert's role is to present "evidence that a particular course of treatment is followed nationally," based on his or her specialized knowledge of medicine. *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C.1996). The expert can also opine as to whether the conduct at issue in the case met, or fell below, that standard of care, and whether it caused injury.

In the courtroom setting, it is only the rare trial which does not see any variation in the testimony of its different witnesses. Our legal system has long relied on independent and neutral triers of fact to weigh the evidence submitted for their consideration, including the character, demeanor, and credibility of the witnesses

8. In the past, some courts held that because a party was "bound" by the testimony of his or her expert witnesses, their conflicting testimony in a malpractice case negated each expert's opinion as to the applicable standard of care. *See* L.S. Tellier, Annotation, *Party Litigant in Civil Personal Injury or Death Case as Bound by Conflicting Testimony of His Own Medical Witnesses*, 53 A.L.R.2d 1229 (1957). The doctrine seems rooted upon *Mudano v. Phila. Rapid Transit Co.*, 289 Pa. 51, 58–59, 137 A. 104, 106–107 (1927), which held that a plaintiff's case will fail when the testimony of his two expert witnesses is so contradictory that the jury is left with no guidance on the issue. This body of law, however, was founded upon the now-disavowed notion that parties could not impeach their own witnesses, and the offering of conflicting expert opinions was seen as the impeachment of each. *See* 53 A.L.R.2d at 1231. *Kosberg* acknowledged the doctrine, but nevertheless allowed such conflicts to be submitted to the jury for resolution, 129 U.S.App. D.C. at 325 n. 5, 394 F.2d at 950 n. 5, consistent with the more modern view that "a party may not necessarily be bound by the conflicting testimony of his or her own medical witnesses." *Conflicting Testimony by Medical Witnesses*, 31A AM.2d *Expert and Opinion Evidence* § 220, at 228 (2002); *see also Brannan v. Lankenau Hosp.*, 490 Pa. 588, 596, 417 A.2d 196, 200 (1980) (limiting *Mudano* to only those instances where the experts "so vitally disagree on essential points as to neutralize each other's opinion evidence," and allowing more minor discrepancies to be submitted to a jury for resolution). *Kosberg*, and our decision here, are therefore in line with the jurisdictions which hold "that the conflict between opposing opinions raises a question for the jury or the trial court to determine." 31A AM. JUR.2d § 220, at 228.

they hear, and come to a common-sense resolution of the facts in dispute. The critical role of the fact-finder, when facts are in dispute, is to find definitively what the facts of the case are. In making these findings, one of the essential functions of the fact-finder is to resolve discrepancies between witnesses, including experts. *See, e.g., Designers of Georgetown, Inc. v. E.C. Keys & Sons,* 436 A.2d 1280, 1281 (D.C. 1981) (per curiam) ("Contradictory expert testimony presents an issue of fact for the fact-finder"); *Rock Creek Plaza–Woodner Ltd. P'ship v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983) ("[A]s a general proposition, when faced with conflicting expert testimony, the trial court may credit one expert over the other or even disregard both in rendering its judgment."). While the majority of our cases have considered discrepancies between experts presented by opposing parties, *see Rock Creek Plaza,* 466 A.2d at 859, *Designers of Georgetown,* 436 A.2d at 1281, the role of the jury is no different where there are discrepancies in the testimony of experts presented by one party.

■ Permitting the case to go to the jury in this circumstance is not only consistent with the jury's role, but also mindful of the plaintiff's burden to present evidence of a *prima facie* case. When there is no expert testimony or the single expert's testimony is inconclusive as to the proper course of treatment, the plaintiff's case necessarily fails because of a lack of proof as to a required element of the tort of negligence, the standard of care. *See Quick v. Thurston,* 110 U.S.App. D.C. 169, 171, 290 F.2d 360, 362 (1961) (testimony of plaintiff's only expert inconclusive as to standard of care held insufficient to present *prima facie* case). But when there are discrepancies between the testimony of two or more expert witnesses offered by the plaintiff—either one of which is suffi-

cient to establish the standard of care—there is proof of the standard of care for the jury's consideration. Given that the burden is on the plaintiff to show a deviation from the standard of care in a medical malpractice case, *see Travers,* 672 A.2d at 568–70, the disagreement between the plaintiff's experts will necessarily show that there is a wide range of medical opinion as to the proper course of action, and defense counsel will alert the jury that the plaintiff recognizes there is not only one acceptable course, but a range of opinion and more than one option or means of treatment. In such a case it is the plaintiff's burden either to convince the jury that the applicable standard of care is the one breached by the defendant or to show that the defendant's actions fell below all of the acceptable options.

## C.

■ There was sufficient evidence in this case for the jury to conclude that Dr. Burke acted in violation of the standards of care, as articulated by either Dr. Anderson or Dr. O'Leary. Commentators have opined that "the jury's finding of negligence is thus always that the actor *should not* have acted as he did; this implies a finding that he *should have acted otherwise, but not necessarily in any specific manner.*" 3 FOWLER V. HARPER ET AL., THE LAW OF TORTS 545 (3rd ed.1986) (emphasis in original). Thus, although a jury must find that a physician's actions fell below the standard of care in order for there to be a finding of negligence in a medical malpractice case, the jury need not definitively settle on a single standard of care, so long as it agrees that, under all of the standards presented, the physician's conduct fell short. In this case, the differences in the testimony of the appellees' two expert witnesses with respect to the standard of care did not prevent all the jurors from coming to a

common understanding that the doctor's actions were below the standards articulated by both experts.

Appellant admitted that he applied traction in an attempt to deliver Haley, and then performed the McRoberts maneuver, re-applied traction, and lastly, applied suprapubic pressure to the mother. None of these maneuvers was successful and Haley was eventually delivered simply by locating her hand and seizing it to lead the rest of her body from the birth canal. Dr. Burke's application of any traction, when presented with shoulder dystocia, violated the standard of care as articulated by Dr. Anderson. It also violated Dr. O'Leary's standard of care which mandated that traction should be utilized only in conjunction with the McRoberts maneuver and while suprapubic pressure was applied. By applying traction before the McRoberts maneuver and suprapubic pressure were utilized, Dr. Burke violated the standard of care identified by Dr. O'Leary. Additionally, Dr. O'Leary testified that if any traction was applied, it was to be gentle; the use of excessive traction would violate the standard of care. After delivery, it was documented that Haley's face was bruised, and Dr. O'Leary testified that normal delivery forces will not produce bruising. Mr. Scaggs, who was present for the delivery, testified that he saw Dr. Burke "pull what I would consider very hard," and observed his arms tense during the pulling. He later asked Dr. Burke if such pulling was normal, and, according to Mr. Scaggs, Dr. Burke responded that such pulling was "not usual." Even though Dr. Burke denied Mr. Scaggs's version of events, there was enough evidence from which the jury could conclude that Dr. Burke violated the standard of care established by Dr. O'Leary either by applying traction prematurely or with excessive force.

## III.

■ Appellant asserts in the alternative that, even if the appellees presented a prima facie case, because multiple theories of liability were submitted to the jury— namely, whether the jury found that Dr. Burke violated the standard of care in his use of traction (by applying any traction at all, or excessive traction, or by applying traction before trying alternative maneuvers), by not making an episiotomy, or any of the other alleged violations of the standard of care, see, *supra*, note 6—we cannot be certain that the jurors all agreed as to how the appellant violated the standard of care. We hold that the appellant, by not requesting a special verdict form, has forfeited his right to complain on appeal that the jury might not have been unanimous in its views.

The jurisprudence of this court establishes that a civil appellant is estopped from challenging the validity of a verdict which could rest on a theory of liability unsupported by the evidence, where the appellant did not take prophylactic steps in the trial court to ensure that the error is amenable to appellate review. See *Nimetz v. Cappadona*, 596 A.2d 603, 607 (D.C. 1991); *George Washington Univ. v. Lawson*, 745 A.2d 323, 328–29 (D.C.2000). In *Nimetz*, this court

> adopt[ed] the rule that a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury.

596 A.2d at 608.

In this regard, appellant's argument is not that the evidence was insufficient to prove the standard of care with respect to the use of traction—we hold that it was—

but that all the jurors might not have evaluated appellant's conduct against the same standard of care. Because we have no record basis for concluding that the jury's verdict was not grounded on a common understanding of appellant's breach of the standard of care, the same concern for judicial efficiency and respect for jury verdicts pertains. *See Nimetz,* 596 A.2d at 608. As noted, although there was expert testimony on a number of breaches of various applicable standards of care, the case presented to the jury was primarily focused on the use of excessive traction. See, *supra,* note 6. On this record, we perceive no reason to relieve appellant of the burden to create a record that persuades this court that error has occurred and that he has been prejudiced by it. *See Newell v. District of Columbia,* 741 A.2d 28, 33 (D.C.1999).

■■ In order for the issue to be sufficiently preserved on appeal, not only must a special verdict form be requested, but "counsel must state the request with specific precision to indicate the specific interrogatories that should be included in the special verdict form, object to their noninclusion, and include the proposed special verdict form in the record on appeal." *Id.* The record shows that appellant agreed to a general verdict form, and did not request any special interrogatories. Thus, under *Nimetz* and its progeny, because appellant failed to request a special verdict form, he is estopped from arguing that the jury's verdict may rest on alternate theories of liability.

For the foregoing reasons, the judgment for appellees is

*Affirmed.*