**Lucinda DREVENAK, Appellant,**

v.

**Walter ABENDSCHEIN,
M.D., Appellee.**

No. 98–CV–1097.

District of Columbia Court of Appeals.

Argued Feb. 10, 2000.
Decided May 24, 2001.

Allen T. Eaton, Washington, DC, for appellant.

Michael T. Wharton, Annapolis, MD, with whom Brian J. Nash and Marian L. Hogan, Baltimore, MD, were on the brief, for appellee.

Before RUIZ, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

After a bench trial in this medical malpractice matter, which involved a total knee joint replacement and allegations of improperly treated infection, the trial court rendered judgment in favor of appellee, Dr. Walter Abendschein. Appellant Lucinda Drevenak filed a timely appeal,

alleging that: (1) the trial court used the wrong legal standard in assessing the expert testimony, and thus, based its judgment on "unsupported" testimony rather than "well-validated, documented and supported testimony"; (2) "the trial court did not utilize the correct standards of *Frye*[1] and *Daubert*[2] in evaluating the defendant's expert testimony"; and (3) many of the trial court's findings were clearly erroneous, specifically, those relating to the existence of a "sinus" and "sinus tract" in Ms. Drevenak's knee. Ms. Drevenak attributed the alleged errors to the trial judge making extensive findings months after trial, without the benefit of a trial transcript. Finding no error; holding that the *Frye* admissibility of evidence standard does not apply to an evaluation of the sufficiency of the evidence in this jurisdiction; and concluding that the evidence at trial is sufficient to support the trial court's judgment, we affirm.

1. *Frye v. United States*, 54 U.S.App.D.C. 46, 293 F. 1013 (1923).

2. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

3. Dr. Abendschein received his undergraduate and medical school degrees from Georgetown University in 1959 and 1963. He interned at the University of Pittsburgh. Following his military service, with medical experience in Okinawa and Vietnam, he completed a residency in orthopedic surgery at Georgetown University, and later was board certified in 1972 by the American Board of Orthopedic Surgeons. He became a full-time faculty member at Georgetown, and also entered private practice. At the time of Ms. Drevenak's trial, he was a clinical full professor of orthopedic surgery at Georgetown, the chief of orthopedic surgery at Sibley Memorial Hospital, and vice chairman of the department of surgery. He is a member of the American Academy of Orthopedic Surgeons, and the American Association of Hip and Knee Surgeons. He has

## FACTUAL SUMMARY

The record on appeal shows that, in March 1993, Ms. Drevenak was a 5' 4", 72-year-old senior citizen, weighing around 210 pounds, who suffered from severe degenerative osteoarthritis in her right knee. Twenty years earlier a surgical procedure, known as "a high tibial osteotomy," had been performed on the knee to remove bone and straighten her leg, but the knee continued to degenerate through the years, resulting in pain and instability. Consequently, she was advised to undergo total knee replacement surgery, which Dr. Abendschein performed on March 10, 1993.[3] There were no complications during or after the surgery, and Ms. Drevenak began some physical therapy while she was still in the hospital. However, medical records, at the time of Ms. Drevenak's discharge from the hospital, reflected the presence of "a small area of draining sinus in the distal aspect of the knee."[4]

published articles in his field and lectured both nationally and internationally. During trial, Dr. Abendschein stated that he has completed around 3000 hip and knee replacements, including the first to be done at Georgetown and Sibley.

4. Ms. Drevenak apparently was discharged from Sibley Memorial Hospital on March 22, 1993. Medical records show the following information:

A total knee replacement was carried out and [Ms. Drevenak's] postoperative course was uncomplicated. She was able to be rehabilitated with some early physical therapy with the ability to flex her knee to 60-70 degrees by the time of discharge. Arrangements were made with Potomac Home Health Care for continued physical therapy at home. There was a small area of draining sinus in the distal aspect of the knee which was to be checked at home. The family was advised to bring her into the office in five to seven days for a complete evaluation. She was on no antibiotic coverage at the time of discharge. One of her final cultures was reported following dis-

Following her hospital discharge, Ms. Drevenak continued with physical therapy. On March 26, 1993, approximately two weeks after surgery, a therapist was assisting Ms. Drevenak in her exercises. After Ms. Drevenak had ascended some steps, she was in the process of descending them when she suddenly sat down and her knee split open.[5] Examination revealed an open patellar tendon rupture, which Dr. Abendschein diagnosed as "a traumatic rupture." That same day, Dr. Abendschein reattached the tendon, and did a "complete debridement of the knee with pulsatile lavage." He saw no sign of infection.[6] After surgery to reattach the tendon, Ms. Drevenak apparently was sent to the Carriage Hill Nursing Center in Silver Spring, Maryland. While she was there, a culture was taken on April 9, 1993 of the fluid draining from her right knee. The laboratory report showed "staphylococcus aureus, heavy growth" and "streptococcus, Beta Hemolytic, Presumptive Group A . . . moderate growth."[7] When Ms. Drevenak saw Dr. Abendschein on April 9, 1993 for the removal of sutures, he noted that the "incision [from the knee replacement surgery] is angry but not cellulitic. . . ."[8] He concluded that there was no significant infection.

Dr. Abendschein examined Ms. Drevenak's knee again on April 12, 1993. He detected no sign of cellulitis or deep infection, but there was some drainage from the knee and the incision was "irritated." Because of the April 9th culture, Dr. Abendschein suspected a superficial infection and prescribed the antibiotic, Augmentin, and an antiseptic solution for daily cleaning of the wound. Another examination by Dr. Abendschein took place on April 23, 1993; he noted: "The patient has a serous draining sinus but no evidence of infection in her knee. She is continued on Augmentin for the present time and beta-dine dressings." Dr. Abendschein saw "no sign of excessive swelling, pain, [or] tenderness."

During the period of her recovery from the patellar tendon rupture, Ms. Drevenak fell on April 29, 1993, hurt her left hip, and "sustain[ed] an avulsion of the patella tendon" or a second rupture in her right knee. She was admitted to Sibley Memorial Hospital on the same day. Dr. Abendschein called in an infectious disease consultant who ordered cultures and prescribed intravenous antibiotics.

Ms. Drevenak's second rupture was repaired on May 4, 1993, apparently without incident.[9] Later, after further examina-

charge, showing a coagulation negative Staphylococcus.
A medical form prepared by a nurse or therapist at Potomac Home Health Care on Ms. Drevenak stated: "Patient developed increased warmth and drainage from (R) knee incision 3/20/93. Culture taken with negative results."

5. Records compiled at Potomac Home Health Care indicate that: "While descending [Ms. Drevenak] unexpectedly [and without] warning sat on step[;] bleeding started along incision. [Patient] assisted to chair. . . ."

6. According to Dr. Abendschein, signs of infection would include pus and red, swollen tissue.

7. A note on the laboratory report shows that it was faxed to Dr. Abendschein on April 13, 1993.

8. Simply put, "cellulitic" refers to inflamed connective tissue. Dr. Abendschein explained cellulitis as "excessive redness, and swelling, and induration." Induration, he said, "means that the tissue is hard, and when you touch it, it is so red it blanches, and you can dent it, and then the fluid reaccumulates in it."

9. A May 4th "operative summary" entry in the Sibley Memorial Hospital records recounted Ms. Drevenak's past treatment with Augmentin for "a small draining sinus tract of the right knee," and stated that, "with persis-

tion and diagnosis of her left hip condition, Ms. Drevenak also received a total left hip replacement on May 25, 1993. She remained in Sibley Memorial Hospital until June 8, 1993, when she was discharged to the National Rehabilitation Hospital. With respect to her knee, the following entry appears in the Sibley Memorial Hospital record:

> Her knee did well. The incision had closed, and she was placed in a specially constructed double-upright long-leg brace.
>
> She was kept on antibiotics through her course for both the previous knee cultures.... All of this was directed by the Infectious Disease specialist.

Upon her discharge from the National Rehabilitation Hospital, a record entry regarding examination at admission specified: "Incisions were clean without drainage." Ms. Drevenak continued rehabilitation at the National Rehabilitation Hospital until July 1, 1993, the date of her discharge.[10] At the time of her discharge, the National Rehabilitation records stated: "The patient regained good range of motion in her knee on the right

and was able to learn to ambulate with partial weight bearing on the left." After evaluating Ms. Drevenak on July 1, 1993, Dr. Abendschein made the following notation:

> The patient is evaluated for her right total knee replacement and her left total hip replacement. X-rays show good position of the left total hip replacement, she is having no problem whatsoever. She has no pain in the right knee, she has a 20 degree flexion lag but is able to perform SLR exercises, she has 90 degrees of flexion. X-rays show good position of the prosthesis and good position of the patella indicating the patellar tendon mechanism is still intact. She is continued in the use of the brace and will be re-evaluated in two months.

After her discharge from the National Rehabilitation Hospital, Ms. Drevenak returned to her home in West Virginia. On July 7, 1993, she was admitted to the City Hospital in Martinsburg, West Virginia, due to fever, redness and tenderness of the right leg. Hospital records stated: "The right leg incision showed a large area of erythema [redness] with warmth and

---

tent drainage [she] was now taken back to the operating room for further irrigation and debridement." Furthermore, "[d]eep cultures were taken of a somewhat cloudy fluid which was seen to lie within the knee joint itself." In early May, Ms. Drevenak also was treated for congestive heart failure. For a blood clot in one of her legs, a blood thinning drug, Coumadin, was prescribed.

Records from the National Rehabilitation Hospital reveal the following historical note:

> With the knee in a flexed position since May 4, 1993, it has been protected from forces. [Ms. Drevenak] has been able to ambulate with the knee in full extension wearing an immobilizer. She also has been able to actively range her own knee without restriction.
>
> Postoperative course was otherwise also complicated by congestive heart failure, a

DVT [deep vein thrombophlebitis, or clotting of the veins] documented May 7, 1993, in the leg, placement of a Greenfield filter and a left hip fracture which was [repaired] May 25, 1993.

> The patient received six weeks of combined p.o. and IV antibiotics through June 29, 1993, for her soft tissue infection at the patellar tendon.

10. In summarizing the history of Ms. Drevenak's illness, the National Rehabilitation Hospital discharge summary specified that Ms. Drevenak had "received six weeks of combined [oral] and IV antibiotics through June 29, 1993, for her soft tissue infection at the patellar tendon." However, the results of her physical examination upon admission showed that: "Incisions were clean without drainage."

tenderness. There was a small open area draining a small amount of pus." The impressionistic diagnosis was: "Cellulitis and/or infection of right knee prosthesis." Although a culture was taken, it "was lost by a combination of laboratory and nursing error." On July 8, 1993, Ms. Drevenak was transferred to Sibley Memorial Hospital.

Upon examining Ms. Drevenak following her return to Sibley Memorial Hospital, Dr. Abendschein concluded that her right knee was infected. She was given intravenous antibiotics, and Dr. Abendschein performed arthroscopic surgery and irrigation on July 8th and 12th. Moreover, on July 12th, cultures of fluid were taken from Ms. Drevenak's knee. When improvement did not occur, cultures of knee fluid again were taken, and Dr. Abendschein removed the knee prosthesis on July 19th, noting:

> The patient has undergone two arthroscopies with vigorous debridement and still has a recurrent effusion of the knee. The last culture was negative but the fluid was clearly purulent and the components were removed and she was placed in a spacer with an immobilizer.

After her discharge in early September 1993, Ms. Drevenak eventually returned to West Virginia. Her health continued to decline, and in late 1993 and early 1994, she had a range of medical problems relating to the knee and hip; and other medical conditions, including non-insulin dependent diabetes mellitus. Medical records also show that Ms. Drevenak's problems with right knee infection persisted into 1996.

On March 8, 1996, Ms. Drevenak filed suit against Dr. Abendschein, alleging negligence, medical malpractice, with respect to her total right knee replacement. In essence, Ms. Drevenak maintained that Dr. Abendschein failed to recognize and properly treat the symptoms of deep infection that caused her patellar tendon to rupture twice, and ultimately forced the removal of her right knee prosthesis. Two months after a bench trial, extending approximately one week in March 1998, the trial court summarized its findings and conclusions over a two-day period, without the benefit of a trial transcript. Subsequently, judgment was rendered in favor of Dr. Abendschein. Ms. Drevenak made no post-trial motion, but filed a timely notice of appeal.

## ANALYSIS

Ms. Drevenak's arguments on appeal are directed toward the trial court's assessment of the expert evidence presented, and its findings pertaining to sinus and sinus tract drainage. In particular, she maintains, in essence, that her experts were superior to those of the defense because, consistent with *Frye* and *Daubert*, *supra*, her experts supported their opinions with scientific publications. Before addressing Ms. Drevenak's specific contentions, we set forth a summary of the pertinent expert testimony, and the trial court's findings and conclusions. Then we reiterate the general applicable standard of review.

In this complex and hard-fought case, five experts testified during trial. Two of the experts rendered opinions relating to infectious diseases and Ms. Drevenak's right knee infection: Dr. Chester Smialowicz for Ms. Drevenak; and Dr. Andrew Mayrer for Dr. Abendschein. Three experts gave national standard of care testimony relating to orthopedic surgery: Dr. Lawrence Shall for Ms. Drevenak; and Doctors Randall Lewis and Richard Grant for Dr. Abendschein. Dr. Abendschein also testified on his own behalf.

Dr. Smialowicz finished Mount St. Mary's College in Emmitsburg, Maryland in 1963. He completed his medical studies

at the University of St. Louis in 1967. During his one-year internship at a hospital in Camden, in New Jersey, he concentrated on "medicine" and "general surgery." Following his medical experience in Vietnam and Alabama as part of the armed forces, he began his three-year residency in internal medicine at the Cooper Medical Center in Camden, New Jersey, rising to the positions of. Chief Medical Resident, and then Chief Resident. In 1973, he commenced a two-year fellowship in infectious diseases at the Medical College of Pennsylvania in Philadelphia. He was board certified in neither infectious diseases nor internal medicine.[11] However, he has specialized in infectious disease in private practice since 1975. He also serves as a Clinical Instructor in Medicine at the Robert Wood Johnson Medical School in Piscataway, New Jersey; as a consultant in infectious diseases at various hospitals, medical centers, and clinics in New Jersey; and is head of the infectious disease department at the Deborah Heart and Lung Center in New Jersey. He consults on at least two cases of prosthetic infection per year. In terms of additional training in infectious diseases, Dr. Smialowicz attends either the Harvard or the University of Michigan course on infectious diseases, and national meetings on infectious diseases. He stated that he became familiar with "the national standard of care required of a physician in diagnosing and treating an artificial knee joint which is possibly infected" by attending national meetings and grand rounds and conferences, and by discussing the matter with his "orthopedic colleagues as [he] help[s] them care for [their] patients." The trial court accepted Dr. Smialowicz as an expert in "the diagnosis and treatment of infected knee prosthesis."

Dr. Andrew Mayrer, the infectious disease expert for Dr. Abendschein, received an A.B. degree in biology from Columbia College in 1970, and his medical degree from Yale Medical School in 1974. He completed a three-year residency at the University of Pittsburgh, followed by a three-year infectious disease fellowship at Yale. From 1980 to 1984, he was on the Yale medical faculty, division of infectious disease. In 1984, he became Attending Physician and Director, Division of Infectious Diseases at Sinai Hospital, in Baltimore, Maryland, and an Assistant Professor of Medicine at the Johns Hopkins School of Medicine. He became board certified in internal medicine in 1977, and in infectious diseases in 1996. He has also served as an Adjunct Assistant Professor of Pathology at the University of Maryland, and Medical Director of the Northwest Convalescent Center nursing home. He has lectured on superficial and deep wound infections, and for the past twenty years, has been a consultant on one case per month involving infection of orthopedic prosthetic devices, mostly (75 to 80 percent) involving the hip but some concerning the knee. Referring to the "literature," he stated that he was familiar with the standard of care "in terms of the diagnosis, treatment and management of infections of a prosthesis following surgery," as well as "issues of causation and damages." His resume reveals that he has done extensive writing and lecturing on a variety of medical subjects, including infections.

At trial, Dr. Smialowicz stated that Dr. Abendschein failed to "fulfill[ ] the national [standard of] care required in diagnosing and treating ... a possible postoperative infection after he performed the total knee replacement on ... [Ms.] Drevenak on March 10, 1993." Specifically, he failed to

11. Dr. Smialowicz acknowledged that in order to sit for the infectious diseases board, he would first have to obtain board certification in internal medicine.

recognize "clues" that deep infection was present. Had Dr. Abendschein diagnosed the deep infection

> [d]uring the critical first four weeks in the postoperative period ... [and had a debridement been performed] followed by six weeks of antibiotic therapy, the literature and the experience has been that there is a significant salvage rate of 80 percent or more in saving these prostheses, and that once one ignores these signs and clues, and once one gets past one month, and the farther you get past it, you are now in the chronic stage of a prosthetic knee infection, and now if you try to perform the same procedure with debridement followed only by antibiotics in the attempt to salvage that prosthesis, your success rate drops down to something like 8 percent.

In connection with deep infection, Dr. Smialowicz referenced the work of Dr. Conen in the late 1950s on staphylococcus aureus and its dangers. He discussed group A beta-hemolytic streptococcus, which is "extremely virulent in infecting tissue and in destroying tissue." Staphylococcus aureus and group A beta-hemolytic streptococcus "work synerg[i]stically." That is, "[e]ach one has [its] own particular virulent ability, but when they are together, they are even more powerful in causing infection in tissue." He pointed out that: "Elderly patients have a higher rate of postoperative infection with prostheses," and that prior surgery performed in the same area of the body "is an increased risk factor," as is obesity and "delayed wound healing." As early clues showing deep infection of the knee prosthesis, Dr. Smialowicz cited: fever of 100 degrees or higher on seven days in a twelve day period following surgery, despite the fact that Ms.

Drevenak was given Tylenol and Percocet; drainage from the wound; erythema, or redness; and pain, even though Ms. Drevenak's medical charts did not mention pain.[12]

Because Dr. Abendschein failed "to fulfill the national standard of care between March the 10th and the 22nd with respect to his diagnosis and treatment of [Ms.] Drevenak's infection ...," in Dr. Smialowicz' view, "a sequence of other injuries [resulted,] aside from having to have the prosthesis eventually removed." Thus, Dr. Smialowicz attributed the two ruptures of the patellar tendon, the fall and hip fracture, the "deep vein thrombophlebitis, clotting of the veins in [Ms. Drevenak's] legs"; and bone destruction in the knee to the failure of Dr. Abendschein to diagnose the deep infection in Ms. Drevenak's knee in March 1993, or within four weeks of her total knee replacement surgery; and to perform "debridement surgery ... followed by six weeks of [intravenous] antibiotics for the staphylococcus...." To support his opinion, Dr. Smialowicz referenced the TEXTBOOK OF INFECTIOUS DISEASES, edited by Dr. Gorbach, and specifically, Dr. Karchner's chapter on infected prostheses; Campbell's TEXTBOOK OF OPERATIVE ORTHOPEDIC PROCEDURES; Dr. Lotke's POSTOPERATIVE INFECTIONS; and THE PRINCIPLES AND PRACTICE OF INFECTIOUS DISEASES by Doctors Mandel, Douglas and Bennett.

Turning to the subject of signs of infection during Ms. Drevenak's hospitalization between March 26th and April 3rd, Dr. Smialowicz mentioned "drainage from the knee wound," fever over 101, and a "slightly elevated" white cell blood count of 10,800. He opined that the antibiotics that Ms. Drevenak received in this time period had the effect of "suppress[ing] the infec-

---

12. Dr. Smialowicz expressed the view that pain must have been present because Ms. Drevenak was taking Percocet.

tion, but certainly not cur[ing] a deep-seated infection." Although Dr. Smialowicz acknowledged that Dr. Abendschein ordered a culture during the March 26th repair of the patellar tendon, he saw no evidence of the results, nor any follow-up, in Ms. Drevenak's medical records.

Next, Dr. Smialowicz focused on the period April 8th through April 29th. He singled out April 8, 1993 as significant because of a medical record entry showing redness, warmth, and drainage. He pointed out that a culture taken of the fluid from Ms. Drevenak's leg on April 9th revealed both staphylococcus aureus and group A beta streptococcus, both of which are virulent organisms that can act synergistically to cause serious infection and consequent damage to a prosthesis. To substantiate his opinion, Dr. Smialowicz cited a 1978 study by Dr. McAlac stating that eighty percent of the time, "when staphylococcus aureus is cultured from a sinus tract ...," it is indicative of deep infection. He determined that Dr. Abendschein's decision to prescribe Augmentin, an oral antibiotic, to counteract the organisms in the culture, was inconsistent with the national standard of care "because [Augmentin] will not attain adequate levels in the deep bone prosthesis in order to eradicate the infection." Rather than prescribe Augmentin, Dr. Abendschein should have ordered re-hospitalization and performed an aspiration of the joint "to see if those same organisms were in the joint fluid so that proper intravenous antibiotics [could have been] started." Had Dr. Abendschein undertaken the proper course of action during the April 8th to 29th period of time, Dr. Smialowicz estimated that there was "probably at least a 65 to 70 percent chance of salvage ... [of the prosthesis]." In addition, the destruction of the bone could have been avoided since the cure rate for acute osteomyelitis "is very high." He attributed the negative culture results on April 29th to the Augmentin and the intravenous antibiotics which "mess[ed] up the evidence" of deep knee infection.

On cross-examination, counsel for Dr. Abendschein used Dr. Smialowicz' earlier deposition to try to show his lack of familiarity then with some of the medical works on which he relied at trial, or to point out that counsel for Ms. Drevenak had sent him the material. In fact, during his deposition, Dr. Smialowicz apparently referenced only one study, which appeared in the AMERICAN JOURNAL OF KNEE SURGERY IN SPRING 1996, "Diagnosis and Management of the Infected Total Knee Arthroplasty" by Simmons and Stern.

Defense infectious disease expert, Dr. Mayrer, had a different evaluation of Dr. Abendschein's course of action. He opined that: "Dr. Abendschein comported with the [ ] standard of care expected of an orthopedic surgeon following [Ms. Drevenak's] knee procedure, and subsequent events relating to two or three episodes of dehiscence, opening up of the surgical wound that Dr. Abendschein had initially closed." He found Ms. Drevenak's "mild post-operative temperature" to be "fairly typical," based on his experience and involvement with "the dozen of scores and hundreds of orthopedic patients." The "intermittent drainage" from Ms. Drevenak's wound was not unusual and "did not constitute ... any evidence of a serious side effect or infection" at the time of Ms. Drevenak's discharge from the hospital.

During the period between March 10 and 26, Dr. Mayrer concluded that "[a] number of factors militate quite heavily against deep knee infection...." For example, Ms. Drevenak "did not have significant amounts of pain"; "she did not exhibit the expected diminished range of motion while she was doing her rehabilitation

therapy"; "she was taking virtually no pain medication at home ...."; and a March 26th examination of Ms. Drevenak revealed no pus, and no "significant loss of bone." [13]

In discussing infection, Dr. Mayrer distinguished between "acute and fulminant" infection indicating the presence of "virulent aggressive nasty organisms that behave in a very prompt manner with respect to tissue damage and the consequences thereof," and "chronic or indolent" infection where "less virulent, less invasive organisms [are present] that don't come on like gang busters, but rather that develop slowly over time with the manifestations of inflammation or infection." Offering further explanation, Dr. Mayrer stated:

Most infectious disease people regard the acute process due to the more virulent organism such as staph aureus as the sort that come on fairly quickly, that have a high degree of pain, often have fever, elevated temperatures, a lot of local findings, redness, pain, swelling, and so forth.

In contrast, the more indolent or chronic infections of prosthetic knees tend not to have nearly as much in the way of this fulminant aggressive impressive man[ife]station.

Had there been "serious underlying tissue destruction" at this time, it is "unlikely that [physical therapy] could be conducted...." Moreover, given his distinction between acute and fulminant infection and chronic and indolent infection, Dr. Mayrer concluded that if staph aureus had been present in the March 18th/19th culture of fluid from Ms. Drevenak's knee, one would have expected to see "lots of pus cells," but "[n]ot a single pus cell was seen under the microscope." In Dr. Mayrer's opinion, it "would have been inappropriate to have inserted a needle [to perform an aspiration between March 10th and March 26th] for so little cause [in] recently operated joint space."

Dr. Mayrer acknowledged that an April 9th culture of the fluid drainage from the site of Ms. Drevenak's surgical knee wound contained "Group A Beta, beta strep," and "staph aureus." However, he rejected Dr. Smialowicz' theory of a synergistic infection based on the presence of the two organisms. He opined that a synergistic infection was "[n]ot at all likely." [14] Had there been a synergistic infection, the consequences would have been worse than those previously identified by Dr. Mayrer.[15] In fact, according to Dr. Mayrer, "streptococcus Beta hemolytic presumptive Group A" played no role "in the bug that damaged Ms. Drevenak's knee." [16] At most, it was a pathogen that "invaded superficial tissue," and staph aureus "may well have been a simple colonizer [a thin

13. Consequently, even assuming that the results of the March culture were lost, Dr. Mayrer testified that Dr. Abendschein was not required to take any further action regarding the culture.

14. Furthermore, Dr. Mayrer asserted that: "These two organisms are very common together as causes of simple things like impetigo, diaper rash, the sort of common cutaneous skin infections that even normal diabetic people can get."

15. Dr. Mayrer described streptococcus Beta hemolytic presumptive Group A as an organ-

ism that "goes straight to the kill ..., it can cause pharyngitis in the throat. It can cause a cellulitis of the skin...." There "have been very rare isolated cases of deeper infection involving muscle tissue," and "can even cause a toxic shock syndrome."

16. Dr. Mayrer pointed out that "[s]everal years later" at another hospital, Ms. Drevenak was infected with Group B strep, which is different from Group A, and which was "totally unrelated" to this knee "event."

veneer of normally occurring bacteria on the skin] a that point." [17] Dr. Abendschein's prescription of Augmentin was "appropriate" and "any limited evidence of early tissue invasion disappeared." [18] In fact, direct observation on May 4th showed no sign of a virulent staph aureus infection, and cultures taken in late April and early May revealed none.[19] Consequently, during the period March 26 to April 29, 1993, "the standard of care would not have required [Dr. Abendschein] to do ... an aspiration." He added that an aspiration "may have been counter productive and dangerous .... [because] any sort of additional trauma is one trauma too many in a joint that's had number one surgery and subsequent wound dehiscence. So any additional trauma is not desirable and could in fact turn the clock back in terms of healing." The needle would have to enter "a sterile area" and could "caus[e] bleeding in the area, tissue destruction, introduction of those very skin germs that we hope won't get in there through other means."

In discussing the clear appearance of acute infection in Ms. Drevenak's knee in July 1993, Dr. Mayrer rejected the probability that staph aureus was present deep in the knee at a much earlier date. He stated:

My opinion is that an acute fulminate staph aureus infection would not behave in an indolent manner dragged over months, and weeks and weeks.

It is much more likely the events in July represent the first serious time that a deep seeded staph aureus infection befell the plaintiff's right knee.

He pointed out that Ms. Drevenak had received "[i]ntravenous antibiotics [April 29th to June 9th] followed by several weeks of oral antibiotics [through June 30th]." Moreover, the onset of symptoms signaling deep knee infection was "sudden" and "abrupt." On July 4th, there was a "[s]udden onset of fever ...," and on July 7th, "[s]he abruptly developed redness and tenderness over the area of the right leg, the knee area of the right leg."

During cross-examination of Dr. Mayrer, Ms. Drevenak's counsel used passages from textbooks regarding prosthetic device infection, and inquired whether Dr. Mayrer agreed with them. One of the areas on which Ms. Drevenak's counsel concentrated was the existence of a "sinus tract." He asked whether Dr. Mayrer agreed with the statement: "[A] prosthesis exposed at the base of an unhealed surgical wound of the end of a sinus tract is obviously infected." Dr. Mayrer replied: "More likely than not it's true." However, Dr. Mayrer declared that he "could not characterize [what Ms. Drevenak had on April 9th] as a

---

17. Dr. Mayrer expressed some uncertainty about staph aureus. When asked: "Do you have an opinion to a degree of reasonable medical probability as to whether these bugs cultured out on April 9th, of 1993 represented a superficial or a deep knee infection or just a colonizing state," Dr. Mayrer responded that he was "a little less certain about staph aureus...." He added, however: "It's elsewhere on her skin, there is no reason to believe why it would not be in drainage as well."

18. Dr. Mayrer again expressed the view that the oral antibiotic would not have masked a deep knee infection: "I believe it is unlikely that an oral antibiotic used for presumably mild soft tissue superficial infection would have the power to render negative a culture of an alleged deep infection much less quiet down any signs or symptoms of this putatively fulminant infection."

19. Dr. Mayrer was asked his "opinion to a degree of probability as to when the bug which eventually was discovered in July of 1993 became inoculated to a degree of probability to [Ms.] Drevenak's knee." He stated, in part: "I think more than likely late April into May at some point, maybe June, one of these skin colonizers made its way in."

sinus tract or not." Nonetheless, he went on to say that: "A sinus tract, a hole that extends and bores all the way to the base of unhealed surgical wound to the site of a prosthetic device is in fact obviously infected. That is not what [Ms. Drevenak] had." He also mentioned his recollection that Ms. Drevenak was a diabetic, and stated that: "About 50 percent of diabetics will have staph aureus cultured from their skin normally...." Moreover, in response to a question from Ms. Drevenak's counsel, Dr. Mayrer maintained that: "[T]he only way to prove [the origin and termination of a draining sinus] would be to take [Ms. Drevenak] back to the OR [operating room] or do a dangerous radiographic procedure squirting [dye] in which would only aggravate things." In his view, "the clinical judgment of the orthopedist would make it inappropriate to do either of those definitive diagnostic procedures based on all available clinical information at that point in time."

During his cross-examination, Dr. Mayrer distinguished between a "known underlying osteomyelitis with a sinus tract" and a "post-operative draining wound." On redirect, in response to an inquiry as to the difference between a sinus tract and a sinus, Dr. Mayrer stated:

> Well, it's a difference between one railroad tie and a whole line of railroad ties called a train track.

20. Dr. Mayrer read the following definition from DORLAND'S:
   A cavity or channel, a general term for such spaces as the dilated channels for venous blood in the cranium or liver or, or the air cavities in the cranial bones, an abnormal channel [or] fistula containing the escape of pus.

21. The page from STEDMAN'S MEDICAL DICTIONARY, 25th edition, which contains the definition of "sinus" and which was admitted into evidence actually reads:

A sinus is just a tie, a hole. A tract is something that goes further than just a hole. It's like a little thin column going from point a to point b.

On recross-examination, Dr. Mayrer was asked to read the definition of "sinus" found in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY,[20] and STEDMAN'S MEDICAL DICTIONARY. Ms. Drevenak's counsel then requested, without objection, that the trial judge take judicial notice of Stedman's definition which reads:

> Sinus cavity channel hollow, a channel for the passage of blood or lymph without the coats of an ordinary vessel. Two, a hollow in the bone or other tissue. Three, a fistula or tract leading to a separating cavity.[21]

During his recross-examination, Dr. Mayrer summarized Stedman's definition as follows: "The first was channel, the second was h[o]llow or hole, the third is a fistula or tract."

Of the three standard of care experts, Dr. Larry M. Shall testified for Ms. Drevenak. He graduated from Ohio State University in 1977 and the Medical College of Ohio at Toledo in 1980. His orthopedic surgery residency took place at the Mt. Sinai Medical Center of Cleveland, Ohio. After his residency, he received a fellowship at Christ Hospital in Cincinnati, Ohio, where he focused on "sports medicine, surgery of the knee and shoulder." He was certified by the American Board of Ortho-

1 ... A channel for the passage of blood or lymph; without the coats of an ordinary vessel; *e.g.,* blood passages in the gravid uterus or those in the cerebral meninges. 2. A hollow in bone or other tissue. 3. A fistula or tract leading to a suppurating cavity. WEBSTER'S NEW WORLD DICTIONARY, Second College Edition, defines "suppurate" as "to form pus underneath[;] ... to form or discharge pus; fester."

pedic Surgery in 1989. He practices at Orthopedic Associates of Virginia in Norfolk, Virginia, and serves as an associate professor at the Eastern Virginia Graduate School of Medicine and as a clinical instructor at Old Dominion University. At the time of trial he was the editor of the Journal of Arthroscopy, and had published approximately 20 articles on "knee surgery, but not total joint replacement"; shoulder surgery, some rehabilitative technique in the shoulder. He had performed approximately 200 total knee replacements.

Dr. Shall became "familiar with the national standard of care required of a board certified orthopedic surgeon in diagnosing and treating an infected knee prosthesis" through his training, his practice and continuing medical education, and attending conferences sponsored by the American Academy of Orthopedic Surgeons. He opined that Dr. Abendschein's diagnosis, care and treatment of Ms. Drevenak "fell below the standard of care," essentially because he ignored warning signs and "no attempt was made to make a definitive diagnosis of a deep space infection until the time had passed where salvage of the prosthesis was no longer possible or no longer probable."

Having ignored the warning signs of deep knee infection, according to Dr. Shall, Dr. Abendschein failed to follow the appropriate course of action "to expeditiously make the diagnosis of a deep-seated infection about a prosthesis in time to effect treatment that would probably salvage the prosthesis." Specifically, he failed to obtain a culture by conducting an aspiration ("plac[ing] a needle through the soft tissue

and aspirat[ing] fluid at the joint surface"), or to determine what happened to the results of the April 9th culture. Furthermore, although other cultures were taken, the results were unreliable because of the antibiotics that Ms. Drevenak was taking.

When Ms. Drevenak's counsel asked whether Dr. Shall was "aware of any treatise which [he] would consider to be authoritative in the diagnosis and treatment of an infected knee prosthesis," he mentioned "several." [22] In terms of the relationship between these articles and his testimony, Dr. Shall stated that his opinions were "formulated", in part, "from the existing literature."

On cross-examination Dr. Shall estimated that "5 percent" of his experience concerned total knee replacement surgeries. He acknowledged that obesity is a potentially complicating factor for an orthopedic surgeon, and that the blood thinning drug Coumadin (given to Ms. Drevenak to avoid or control blood clotting) could "protract" the knee drainage. Moreover, he admitted that questions relating to staph aureus and Beta hemolytic group A strep were "a little out of [his] league," and agreed that he would "defer to an infectious disease person." However, he maintained that the oral antibiotic, Augmentin, masked a positive culture of Ms. Drevenak's knee. Dr. Shall also rejected the theory that Ms. Drevenak's patellar tendon ruptured because of trauma, but indicated that he has never attended to a "total knee arthropasty" patient with a ruptured tendon.

Dr. Randall Lewis, a Clinical Professor of Orthopedic Surgery at George Washington University and Associate Clinical Professor of Orthopedic Surgery at George-

---

**22.** These included: Lotke's Postoperative Infections in Orthopedic Surgery; Simmons and Stern, "Diagnosis and Management of the Total Knee Arthroplasty," JOURNAL OF KNEE SURGERY; Hayter and Mallory, "Infections in Total Joint Replacement"; CAMPBELL'S OPERATIVE ORTHOPEDICS; and "The Diagnostic Value of Sinus Tract Cultures in Chronic Osteomyelitis."

town University, with medical privileges at Sibley Memorial Hospital, Georgetown University Hospital, George Washington University Hospital, Suburban Hospital and the National Rehabilitation Hospital, testified for the defense. Dr. Lewis graduated with highest honors from Yale University in 1965 and with honors from Harvard Medical School in 1969. He received two years of surgical training in Boston; spent two years as a clinical associate at the National Institutes of Health as a commissioned officer in the Public Health Service; and completed three years of orthopedic training at the Hospital for Special Surgery in New York City. During his training in Boston and New York, he held teaching positions at Harvard and Cornell, respectively. He was board certified in orthopedic surgery in 1978; is a Fellow of the American Academy of Orthopedic Surgeons and served as a member of its Board of Counselors for six years; and is a charter member of the American Association of Hip and Knee Surgeons, whose members "largely specialize in joint replacement and associated conditions." He has also done consulting work at the National Institutes of Health; and has published material concerning surgery and orthopedic surgery in scientific journals as well as edited books.[23] He testified that he has known Dr. Lotke, the author of one of the texts to which Ms. Drevenak's counsel and experts referred, for many years and has invited him to speak at "societies of which [Dr. Lewis is] a member."

Dr. Lewis estimated that during his career, he has performed between 2,000 and 3,000 total knee replacement surgeries, including approximately 12 to 15 involving the repair of a ruptured tendon. Other doctors have referred cases, manifesting complications of joint replacement, to Dr. Lewis. During a twenty-five year period, Dr. Lewis has "seen probably 125, perhaps 150 infected total knees."

Dr. Lewis opined that Ms. Drevenak did not have a deep knee infection between March 10th and March 22nd:

> She came into the hospital. She had her surgery. She progressed quite well. She got an excellent range of motion. She did not have a great deal of swelling or pain. She had some fever for the first four or five days after the surgery, which is routine. Most of our patients have exactly such fevers.... She showed no sign other than a little clear drainage at one spot in her knee that there was anything other than smooth sailing for her clinical course. She achieved motion. She was walking with a walker. She was discharged home on about the 10th or 11th or 12th day, and there was nothing to suggest that she had any deep infection.

He pointed out that although a culture taken in March of the drainage from her knee contained "a few scanty staphylococcus epidermidis, ... that is generally regarded as being a skin organism, a contaminant, and not significant." He noted that the knees of patients who have staph aureus knee infections following surgery "tend to be very swollen, very red, very tender. They are very painful in walking and take lots of pain medicine." In Dr. Lewis' opinion, the March 26th rupture of Ms. Drevenak's patellar tendon was caused by "acute sitting down." As he explained it:

> This is a woman who had previous surgery, ... which is done in that area [the patellar tendon]. [S]he had ... a high tibial osteotomy, which is an operation which, before knee replacements, or

---

**23.** During *voir dire,* he acknowledged that he has not published works pertaining to an in-

fected prosthesis, and does not consider himself an expert in infectious disease.

sometimes even after we began doing knee replacements, was often used to treat arthritis in the knee. This operation involves cutting the bone and going through the tissues in the area of this tendon.

There is obviously always some disturbance of those tissues. There has to be some influence on the tendon, and it is likely that there was some residual ... of this operation many years before. Plus ... she is a big woman by description and sort of putting acute force across there.

Thus, in Dr. Lewis' view, the March 26th rupture of Mr. Drevenak's patellar tendon was not related to deep knee infection, but to trauma.[24] Nor did he believe that she had a deep knee infection between March 26th and April 3.

With respect to the April 3 to 29 period, Dr. Lewis also opined that Ms. Drevenak did not have a deep knee infection because: "[S]he wasn't having spiking temperatures. [Her knee] wasn't red. It wasn't painful, swollen. She was able ... to get about at that point with—she was supposed to be wearing a knee immobilizer and using a walker, but that would be what you would expect following the repair." He opined that Dr. Abendschein followed the appropriate standard of care by monitoring Ms. Drevenak's knee, having her return for examination, and administering antibiotics as a cautionary step, even though he concluded, at that point, that she did not have deep knee infection. He emphasized that Dr. Abendschein exercised appropriate "clinical judgment." The standard of care did not require the performance of an aspiration because:

> [M]y opinion is that the clinical judgment is what counts; that it is not required that you put a needle into the knee if there is no sign ... that there is a deep infection. [I]t is possible to get information from that, but it is possible ... to introduce infection, although that is infrequent, but also to be misled. [T]here is a recent study from a Dr. Harris at Harvard in which—a prospective study ... of every patient who came to have a second operation had an aspiration, and what Dr. Harris' group found was that the results of the aspiration were not useful.

> [I]t gives us cause for concern in terms of what we ought to be doing, whether or not we may not be misled.... What Harris found was that the patients who turned out to have infection had no higher evidence of positive cultures, and the patients who had positive cultures didn't necessarily have an infection. So, the ability to be misled by the aspiration means that it is not a gold standard, it is not required.[25]

24. Thus, Dr. Lewis also agreed that Dr. Abendschein was required to take no action concerning the March culture of Ms. Drevenak's knee, even assuming the results have been lost.

25. Ms. Drevenak's counsel initially objected to Dr. Lewis' reference to the Harris study on the ground that it did not meet the *Daubert* requirement relating to the use of scientific materials. However, after the article was located, Dr. Lewis testified that it was reliable or authoritative, and further acknowledged that it concerned hip aspiration. The work in question, "The Value of Aspiration of Hip Joint Before Revision Total Hip Arthroplasty," by Dr. William A. Harris and Robert L. Barrack, was found in the Library of Medicine and was published in January of 1993. Dr. Lewis thought there would also "be a published peer-reviewed article, because all of the papers presented at the ... American Association of Hip and Knee Surgeons are reviewed." He also stated that the kind of joint discussed in the paper is "irrelevant" because: "What ... has been shown by Harris and Barrack, is that ... if you aspirate a joint, you can be misled by a culture, positive or negative."

Dr. Lewis stressed the fact that Dr. Abendschein's medical notation about the April 9th tissue changes showed that they were not cellulitic, and pointed out that "the pattern described for [staph aureus and strep Group A Beta-hemolytic] infections is cellulitis." Ms. Drevenak's knee did not fit the pattern because there was no "tremendous spreading redness, very—very fiery, very tender...."

Dr. Lewis testified that the course of action Dr. Abendschein followed in addressing the April 9th culture was the appropriate standard of care. He took an x-ray which reflected stability, saw Ms. Drevenak again on April 12th, decided to re-evaluate within two weeks, and placed her on Augmentin "as a precaution." After Ms. Drevenak fell on April 29th and ruptured her patellar tendon again, Dr. Abendschein requested an infectious disease consultation by Dr. Lewis. Dr. Abendschein was faced also with other medical problems which beset Ms. Drevenak. During his testimony Dr. Lewis related the need to address Ms. Drevenak's "occult" hip fracture which required surgery, and her thrombophlebitis. As part of his consultation, Dr. Lewis examined Ms. Drevenak, as well as her medical record, and "found nothing to suggest that she had deep infection, even though everyone was concerned, and she was treated as a preventive." Dr. Lewis attributed the second patellar tendon rupture to the "additional fall" rather than infection. Nonetheless, he indicated that "the prognosis [for Ms. Drevenak] was very guarded, very grave ...." due to her medical history, beginning with the 1982 surgery and extending to her fall. As Dr. Lewis put it: "Her prognosis was very grave in terms of being able to save the knee without infection and to have it work...."

When Ms. Drevenak returned to Sibley Memorial Hospital on July 8th, Dr. Lewis opined that she "got excellent treatment, and ... it was the standard of care." First, Dr. Abendschein tried to save the prosthetic implant by looking at it with an arthroscope, washing and cleaning it; and removed it only after a reaccumulation of swelling in the knee. Dr. Lewis described this course of action and treatment as "the standard of practice ... in most institutions in this country...."

On cross-examination, Dr. Lewis was asked a question which assumed that staphylococcus aureus and streptococcus Group A Beta hemolytic organisms were cultured from a sinus tract on April 9th. He defined a sinus tract as "an opening between the outside and the inside lined with epithelium," and expressed the opinion that, although the word " 'sinus tract' appears a couple of times in the record, ... I think it is probably inaccurate. Drainage and a sinus tract are not the same thing.... [T]here was some drainage, and that is different from a sinus tract." On redirect examination, Dr. Lewis defined a "sinus tract" as "a persistent channel established, like the one passage of your nose or for anything else, where there is a lining that forms in the tract...." He did "not believe that there was truly a sinus tract" in Ms. Drevenak's knee, but agreed that "if [staphylococcus aureus] indeed is cultured from a sinus tract, that further investigation is required...." This testimony comported with that of Dr. Abendschein, who also maintained that had there been a sinus tract in Ms. Drevenak's knee, the only way to "get rid of [it]" is "to cut [it] out."

Dr. Richard Grant, who is board certified in orthopedic surgery, and a director and board examiner for the American Board of Orthopedic Surgery, also testified on behalf of Dr. Abendschein. Dr. Grant received his under graduate degree from Stanford University in 1971, and complet-

ed his medical degree at the Howard University College of Medicine in 1976. After an internship in internal medicine at the Kaiser Foundation in Oakland, California, and military service in the Air Force during which he served his residency in orthopedic surgery at the Wilford Hall Medical Center in San Antonio, Texas, he received additional training through two fellowships, one in total joint arthroplasty and revision arthroplasty at the University of Ohio and the Joint Implant Surgeons Hospital, and the other in adult spine at Baylor University and St. Luke's Episcopal Hospital. During his training, Dr. Grant studied bio-mechanics, which "deals with such things as the forces across the joints, the lever arms that are created by the muscles that move the joints, and . . . bio materials and how those bio materials work in implantation." Dr. Grant is a member of several medical organizations, including the Association of Bone and Joint Surgeons, and the American Board of Orthopedic Surgeons. After leaving the Air Force in 1988, Dr. Grant began teaching spine surgery at Howard University Hospital, became chief of the division of orthopedic surgery, and, at the time of trial, was soon scheduled to become a full professor at Howard.

Dr. Grant has performed "hundreds" of total knee replacement operations, and participated in "over 600, 700 total joint replacements" during his fellowship under Dr. Thomas H. Mallory. His practice has included elbow, shoulder and hip replacement surgery. He described his experience "in diagnosing and treating defective knee joints" and treating and repairing joints "damaged by trauma" as "extensive." For example, in his work as a consultant for the Veterans Administration Hospital, he has "a hip and knee clinic where [he] see[s] joint replacement problems."

Dr. Grant expressed the opinion to a degree of reasonable medical probability that the cause of Ms. Drevenak's March 26, 1993 rupture of the patellar tendon was "[s]udden overloading of the patellar tendon."[26] After the March 26th patellar tendon rupture, time for healing was required, and a protective immobilizer was placed over the knee to prevent Ms. Drevenak from "flexing [her] knee." As a result, it is impossible "to get the full range of motion for that knee," and thus, the knee becomes stiff. After Ms. Drevenak's second patellar rupture, Dr. Abendschein followed an appropriate course of treatment and action, including consulting with an infectious disease specialist, thoroughly evaluating the knee, administering intravenous antibiotics, irrigation and debridement of the knee. Dr. Grant distinguished between inoculation of bacteria

---

**26.** Prior to articulating this opinion, Dr. Grant was asked to assume that Ms. Drevenak weighed 210 pounds, with a height of five feet four inches, had undergone knee replacement surgery, and approximately two weeks after the operation "was in the process of performing physical therapy on her second set of staircase exercises when she suddenly sat down on a staircase, a home staircase." Dr. Grant explained his opinion, in part, as follows:

[I]f you have a fixed point where the leg is fixed and above that fixed point you have about five feet of lever arm accompanied by 210 pounds, what that does with sudden loading is if the quadriceps mechanism is tethered, it puts a sudden overload on the patellar tendon, and if the patellar tendon is loaded rapidly beyond what it can tolerate because it's no longer working in concert with a smooth mechanism or extension mechanism, what will happen is that all of the pressure and all of the stress will suddenly go on this patellar tendon which inserts into the tibial tuberosity.

And in this instance what will happen is this will just snap off of the bone and you will lose your ability to extend the knee because of the patellar tendon evulsion.

into a wound and an actual deep prosthetic infection.[27] Thus, prior to July 1993, Ms. Drevenak had "superficial cultures." Dr. Grant noted that when Ms. Drevenak went to the emergency room of a West Virginia hospital on July 4, 1993, she complained about her left knee, but no entry was made in the medical record showing any problems on the right side. Problems with the right knee were not evident until a few days later.

In Dr. Grant's opinion, "there wasn't an urgent need for an aspiration during [the] time [between March 10, 1993 and April 29, 1993]." "[T]here was actual inspection of the [knee] joint [during the two patellar tendon rupture repairs] which can provide a lot more information than an aspiration." Moreover, Dr. Grant stated:

> It's well established in the orthopedic literature that aspirations of joints especially of joints that have had total joint replacement such as a total knee or total hip replacement can provide a lot of misleading information. . . .

On cross-examination, Dr. Grant was challenged regarding his view that actual inspection of the joint was, in the words of Ms. Drevenak's counsel, "more diagnostic than aspiration of the knee joint as far as determining the sources of micro organism." He was asked to point to any publication expressing that view. Dr. Grant maintained that his view constituted "an interpretation of the current literature in orthopedics as far as total joint arthroplasty is concerned." He also based his view on his experience and the fact that:

"In many instances, if you aspirate a joint you have a good possibility of developing a false positive and in many instances we use[d] to start patients on antibiotics for something that was really a false positive result because bacteria have a way of masking themselves in the joint." In terms of the literature, he singled out Dr. William H. Harris' then recent laboratory studies at Massachusetts General Hospital, and the work of Gristina and Chesterton in 1984.

Dr. Grant also was asked on cross-examination whether Ms. Drevenak had a draining sinus on March 14 and 17, 1993, and whether she received pain medication during her March hospitalization. He responded that he was "not sure that the diagnosis of a draining sinus was made." He added: "I can say this that there was drainage from the knee and it's reported throughout the time that she was operated on. Whether or not you can define that as a sinus, I don't know." With regard to pain medication, Dr. Grant agreed that Demerol, Percocet and Vistaril had been prescribed for Ms. Drevenak, but maintained that they are "commonly prescribed in [the] post-operative [period]," and that drainage from the knee, swelling, redness, elevated temperature and warmth were "common [conditions] for [post-operative] total knee arthroplasty."

When Ms. Drevenak's counsel asked Dr. Grant about several excerpts from Dr. Lotke's work, including one stating that: "[i]n the early post-operative period the only manifestation [of deep infection] may

---

27. Dr. Grant stated:
> [I]f you innoculate you have a different situation from a deep wound infection in this respect.
>
> A deep wound infection has to do with colonization of an area that was not previously colonized. Inoculation would be very similar to injecting bacteria into a joint, but not allowing it to grow.

> And once you have a deep wound infection, usually bio film has been set up on the metal and the bio film or the material that is generated by the bacteria also contaminates the soft tissue in addition to the metal and plastic and the cement that are utilized to hold the joint in place.

be mild, persistent wound drainage combined with a low grade fever," Dr. Grant expressed disagreement with the statement. In addition, he pointed out most of the references for Dr. Lotke's 1992 monograph were outdated since they referred to 1975, 1987 and 1988 works, rather than 1996 or 1993 materials.[28] Dr. Grant also called Campbell's 1992 Orthopedics "outdated," even though he considered it to be "one of many" authoritative texts, and agreed in part or totally with some of the statements read to him from Campbell's text. The thrust of Ms. Drevenak's cross-examination of Dr. Grant with passages from Dr. Lotke's monograph, Campbell's text, and an article by Dr. Mallory, who directed one of Dr. Grant's fellowships, was to establish that where there are certain risk factors such as obesity and prior knee surgery, the orthopedist should have a high level of suspicion concerning such symptoms as elevated temperature, pain, swelling, redness, tenderness, and drainage from the wound, and thus, should avoid oral antibiotics that can mask the presence of a deep infection, and should not only obtain a culture by aspiration, but also take follow-up steps until the results of the culture are known. Dr. Grant resisted the application of fairly extensive excerpts from Dr. Mallory's article to orthopedic specialists, stating that:

> [T]hese are very, very general basic principles that are really meant to peak the interest of the internal medicine individual, the family practitioner, the non-surgeons so they will say, well, if I have a problem like this, please refer this doctor to Thomas Mallory who is an excellent, excellent marketing individual.
>
> So that's why I had to take this with a bit of a grain of salt. And you also have

to consider that this was not published in any orthopedic journal. This was published in the Ohio State Medical Journal.

In addition to that, this was published in 1986 and quite a bit has happened between 1986 and 1993.

On redirect examination, Dr. Grant reviewed certain records from the Potomac Home Health Care group and the Carriage Hill nursing home showing Ms. Drevenak's denial of pain on a day in late March on which she apparently took no pain medication; and a normal temperature in early May on a day on which Ms. Drevenak was described as "cheerful, out of bed and in [a] chair...." He also examined a graphic chart of temperatures for Ms. Drevenak during the period from March 26 to 31, and concluded that "she had pretty much of a normal post-operative course."

*Standard of Review*

■ Ms. Drevenak challenges both legal and factual conclusions of the trial court regarding her bench trial. In this situation, we apply the familiar standard of review: " 'The trial court's factual findings are binding upon this court unless they are clearly erroneous; if the findings are acceptable, we will not disturb the court's judgment unless it is plainly wrong or without evidence to support it.' " *Square 345 Assocs. Ltd. P'ship v. District of Columbia,* 721 A.2d 963, 965 (D.C.1998) (quoting *Wolf v. District of Columbia,* 597 A.2d 1303, 1307 (D.C.1991)); *see also* D.C.Code § 17–305(a) (1997) ("When the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears

---

**28.** At one point during Dr. Grant's cross-examination, the trial court interrupted to comment that the critical question was the re-quired standard of care in 1993, not 1996 or later.

that the judgment is plainly wrong or without evidence to support it.").

*Sufficiency of the Evidence and the Applicable Legal Standard*

The first issues raised by Ms. Drevenak pertain to the trial court's evaluation of the sufficiency of the evidence, particularly its assessment of the testimony presented by the experts. Noting that the trial court characterized the case as "a battle of experts," Ms. Drevenak asserts that: "[T]he trial court admitted that the published scientifically reliable evidence favored [Ms. Drevenak]," but nonetheless gave greater weight to the defense experts whose testimony was not well supported by scientific evidence.[29] Moreover, she argues, "the trial court did not weight the scientific validity of the testimony using the national standard of care or other tests of scientific reliability to assist in determining the reliability of the competing evidence." She also maintains "that the scientific evidence adduced by [Dr. Abendschein's] witnesses was lacking in acceptance in the medical community and [suffered from] the lack of reliability of the opinions rendered." Furthermore, she faults the trial court for failing to evaluate the defense expert testimony under the standards announced in *Frye* or *Daubert, supra.* Although she recognizes that *Frye, supra,* "addresses the *admissibility* of expert testimony" (emphasis supplied in original), she contends that the "[*Frye* standard] should be used by a trial court sitting without a jury in evaluating expert testimony." In es-

sence, Dr. Abendschein argues that the educational backgrounds and experience of his experts met the requirements of a national standard of care, as explained in *Travers v. District of Columbia,* 672 A.2d 566 (D.C.1996). He maintains that *Travers* does not require "[r]eference to a published standard, if indeed one exists...."

 As Ms. Drevenak recognizes, the issue before us is not whether the testimony of defense experts was properly admitted into evidence by the trial judge. Rather, the issue is whether that evidence was sufficient to support the trial court's judgment.[30] This is a question of law, which we review *de novo. See District of Columbia v. Wilson,* 721 A.2d 591, 596 (D.C. 1998). Moreover, we "'view[ ] the evidence in the light most favorable to the prevailing party....'" *Id.* (quoting *District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982) (en banc)).

 In *Hawes v. Chua,* 769 A.2d 797 (D.C. 2001), 2001 D.C.App. LEXIS 81, we examined this court's medical malpractice cases, including *Travers* and *Wilson, supra,* and identified "at least seven legal principles [which] are important in assessing the sufficiency of national standard of care proof"[:]

First, the standard of care focuses on "the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek [v. Shepard,*] 484 A.2d [579], 581 [ (D.C.

---

29. The trial judge stated:

 I'll start by characterizing the case as in my view a battle of the experts. And on the one hand you had the plaintiff's experts, I guess, supplemented by some learned treatises. And on the other hand you had [ ] the defense experts and to a lesser degree, a much lesser degree supplemented by the learned treatises.

30. In *Bahura v. S.E.W. Investors,* 754 A.2d 928, 945 (D.C.2000), we emphasized the difference: "Admissibility and sufficiency, of course, present different issues; an item of evidence may be relevant and admissible, but insufficient, standing alone, to support a finding of negligence."

1984) ]. Second, the course of action or treatment must be followed nationally. *Travers, supra,* 672 A.2d at 568; *see also Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C.1979). Third, the fact that District physicians follow a national standard of care is insufficient in and of itself to establish a national standard of care. *Travers, supra,* 672 A.2d at 569. Fourth, in demonstrating that a particular course of action or treatment is followed nationally, reference to a published standard is not required, but can be important. *Id.* at 568. Fifth, discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or reference to "specific medical literature" may be sufficient. *Id.* at 569. Sixth, an expert's personal opinion does not constitute a statement of the national standard of care; thus a statement only of what the expert "would do under similar circumstances ..." is inadequate. *Meek, supra,* 484 A.2d at 581. Seventh, national standard of care testimony may not be based upon mere speculation or conjecture. *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990).

769 A.2d at 806, 2001 D.C.App. LEXIS 81, at 21–22. Furthermore, as we reiterated in *Bahura, supra:*

> In general, although an opinion rises no higher than the level of the evidence and the logic on which it is predicated, it is for the jury, [in this case, the trial judge in a bench trial], with the assistance of vigorous cross-examination, to measure the worth of the opinion.

*Id.* at 945 (quoting *District of Columbia v. Bethel,* 567 A.2d 1331, 1333 (D.C.1990) (citations omitted)).[31] We are also mindful of our view that:

> [E]xpert testimony is not binding on the trier of fact, *Hughes v. Pender,* 391 A.2d 259, 263–64 (D.C.1978), and the trier of fact is given considerable latitude in determining the weight to be given such evidence. *Id.* Therefore, an expert's testimony as to the standard of care does not conclusively establish the standard of care; it is only evidence of that standard.

*Waldman v. Levine,* 544 A.2d 683, 689 (D.C.1988) (citation omitted). *See also McLeish v. Beachy,* 746 A.2d 892, 896 (D.C.2000) (distinguishing between the weight of testimony and its legal sufficiency); *Richbow v. District of Columbia,* 600 A.2d 1063, 1066 (D.C.1991) ("Although an expert's testimony may not arbitrarily be disregarded or disbelieved, *Rock Creek Plaza–Woodner Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983), when there is some basis in the record for concluding that an expert witness should not be credited, we will not pit our judgment against that of the finder of fact who saw and heard the witness testify.").

In light of this court's prior approach to sufficiency of the evidence challenges in medical malpractice cases, we first address Ms. Drevenak's argument that the "[*Frye* ] standard should be used by a trial court sitting without a jury in evaluating expert testimony." On the rec-

---

**31.** *See also Graham v. Wallace,* 208 W.Va. 139, 538 S.E.2d 730 (2000):

> In determining whether there is sufficient evidence to support a jury verdict·the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.
>
> *Id.* at 732 (citation omitted).

ord before us, we decline to apply *Frye* to the sufficiency of the evidence issue. *Frye* and *Daubert, supra,* not only apply to the admissibility,[32] instead of the sufficiency, of evidence; but equally important, to "novel scientific evidence" or "a novel scientific test or a unique controversial methodology or technique." See *Ibn–Tamas v. United States,* 455 A.2d 893, 895 (D.C.1983) (Gallagher, J., concurring) ("*Frye* requires the profferor of the expert on a new scientific theory to show that the evidence is not still in the experimental stage but has gained a scientific acceptance substantial enough to warrant the exercise of judicial discretion in favor of admissibility"); *Gilkey v. Schweitzer,* 295 Mont. 345, 983 P.2d 869, 872 (1999) ("*Daubert* is limited to novel scientific evidence"); *Colwell v. Mentzer,* 973 P.2d 631, 636 (Colo.App.1998) ("Generally the test of *Frye* [, *supra,*] is applied to novel scientific devices or processes involving the manipulation of physical evidence" (citation omitted)). In contrast to *Frye, supra,* which concerned early consideration of "the systolic blood pressure deception" test, the forerunner of the polygraph test, and which is followed in this jurisdiction, Ms. Drevenak's case does not relate to any novel scientific evidence or test, nor to any unique, controversial methodology or technique. Rather, what is at issue in her case, primarily, is the exercise of clinical judgment based upon specialized medical knowledge. No question is presented here concerning the integrity of the knee prosthesis implanted in Ms. Drevenak's knee; nor is there any indication that the method of aspiration used to obtain cultures of the drainage from her knee was in the experimental stage at the time the aspirations were done. Therefore, we do not regard Ms. Drevenak's case as fitting the mold of one in which novel scientific evidence or a unique controversial methodology or technique is involved.

■ In arguing for the applicability of the *Frye* principle to the sufficiency of the evidence, Ms. Drevenak's counsel expresses concern about determining the reliability of expert evidence. However, there are indicia of reliability other than sole reliance on the quantity of published scientific articles. Even *Daubert, supra,* as Ms. Drevenak acknowledges, identifies publication as only one factor in considering the admissibility of expert evidence, and *Daubert* specifically states that: "publication ... does not necessarily correlate with reliability." *Id.* at 593, 113 S.Ct. 2786 (citation omitted). Indeed, the following factors are all relevant to assessing the reliability of an expert's testimony in a medical malpractice action: the expert's training, board certification in the pertinent medical specialty, specialized medical experience, attendance at national semi-

---

**32.** With respect to the admissibility of expert evidence, *Frye, supra,* which has been followed in this jurisdiction, has been linked to the third prong of the test announced in *Dyas v. United States,* 376 A.2d 827 (D.C.1977):

(1) the subject matter "must be so distinctly related to some science, profession, business or occupation *as to be beyond the ken of the average layman* [emphasis added]"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinions or inference *will probably aid the trier in his search for truth* [emphasis added]"; and (3) expert testimony is inadmissible if

"the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." *Id.* at 832 (quoting McCormick on Evidence, § 13 at 29–31 (E.Cleary, 2d. ed.1972)). The *Dyas* test, to which we still adhere in this jurisdiction, has been called "an antiquated standard...." See *Taylor v. United States,* 661 A.2d 636, 651 (D.C.1995) (Newman, J. dissenting). Moreover, the applicability of *Frye, supra,* to some decisions regarding the admissibility of expert evidence has been questioned. See *Nixon v. United States,* 728 A.2d 582, 588 & n. 14 (D.C.1999); *Daubert,* supra, at 586, 113 S.Ct. 2786.

nars and meetings, familiarity with published specialized medical literature, and discussions with medical specialists from other geographical regions. Of these factors, the trial court obviously emphasized training, board certification in the pertinent medical specialty, and specialized medical experience, but did not ignore the expert's familiarity with published specialized medical literature.

■ The trial judge credited the testimony of the defense experts, generally, because they were "more qualified. . . ." He explained that:

> [I]f you look at the collective experience of these experts, it's clear that the defense experts had many more years of practice and experience in the areas that they were talking about than [Ms. Drevenak's] expert[s]. And they also had a lot more experience in the number of cases that they'd seen over the course of their practice compared to [Ms. Drevenak's] expert[s].

The record on appeal supports the trial court's conclusions regarding the qualifications and experience of the experts. Dr. Smialowicz, Ms. Drevenak's infectious disease expert was not certified in internal medicine nor in infectious diseases. Thus there is a basis in the record for determining that his testimony should not be credited, *see Richbow, supra,* 600 A.2d at 1066, or that the testimony of the defense expert should be given greater weight. In contrast to Dr. Smialowicz, Dr. Mayrer, the defense expert in infectious diseases, who holds degrees from Columbia College and Yale Medical School, has taught at Yale, Johns Hopkins, and the University of Maryland, and serves as Attending Physician and Director of the Division of Infectious Diseases at Sinai Hospital of Baltimore, Maryland; is board certified both in internal medicine and infectious diseases. Furthermore, in comparison with Dr. Smialow-

icz who consults on at least two cases of prosthetic infection per year; over the past twenty years, Dr. Mayrer has consulted on one case of prosthetic infection per month, including hip (75 to 80 percent) and knee joint infection. The trial judge also noted that Dr. Mayrer "had some publications in this area"; his resume has an extensive listing of publications and presentations. Dr. Smialowicz' resume lists three publications, one of which concerns nursing. While Dr. Smialowicz' direct testimony referenced at least four works on infectious diseases, cross-examination revealed that during his deposition he had referenced only one article. Dr. Mayrer was subjected to vigorous cross-examination based on published works, including one by the chairman of his department at Johns Hopkins. He reflected familiarity, although not always total agreement, with these works, even indicating, in one case, that he had had breakfast with the author. Given the respective training, board certifications, experience, publications, and knowledge of the specialized literature, we see no reason to question the trial judge's decision to credit the testimony of Dr. Mayrer. The trial judge not only concluded that the defense experts addressed and articulated the national standard of care, but also effectively undermined or refuted Ms. Drevenak's experts' statement of the standard.

We agree with Ms. Drevenak's counsel that: "Bare assertions of the standard of care by an expert are inadequate." However, as the trial court concluded, the defense experts did more than articulate bare assertions. The trial judge "found that . . . Dr. Lewis was a qualified expert," and gave great weight to the fact that "he'd done total knee replacements about two or three thousand times and that he gets referrals from other surgeons of their patients. And that in 25 years, he's seen

about 125 to 150 infected total knee ... ruptured patellar tendons." Dr. Lewis graduated with high honors from Harvard Medical School, received training in Boston, the Washington Metropolitan area at NIH, and New York, was board certified in orthopedic surgery, is a charter member of the American Association of Hip and Knee Surgeons, has published works on orthopedic surgery in scientific journals, edited books, and for many years has known Dr. Lotke, the author of one of the texts used by Ms. Drevenak's experts. The trial judge also singled out the testimony of Dr. Grant, a graduate of Howard University College of Medicine, because of his role as "director of the American Board of Orthopedic Surgeons, the body that constructs the test for other surgeons who are trying to achieve certification in orthopedic surgery." He also credited the fact that Dr. Grant has performed total knee replacements and has "seen over the past 16 years several hundred infected knees." In addition, during his fellowship under one of the experts in the field, Dr. Thomas Mallory, Dr. Grant participated in "over 600, 700 total joint replacements." In contrast to Doctors Lewis and Grant, Dr. Shall, Ms. Drevenak's standard of care expert, who earned his medical degree at the Medical College of Ohio at Toledo, and was board certified in orthopedic surgery, estimated on cross-examination that "5 percent" of his experience concerned total knee replacement surgeries (which he stated, on direct examination, totaled 200).[33]

■ Although Ms. Drevenak maintained, in a footnote in her brief, that: "The record is replete with numerous ...

instances of unsupported testimony by defendant's cadre of experts," in fact she singles out only one area of alleged error—that concerning the standard of care testimony with respect to aspiration of her knee to detect the presence of deep knee infection. Since there is no contention in this case that any of the defense expert testimony was inadmissible, including that pertaining to aspiration of Ms. Drevenak's knee, it was the trial judge's task in this bench trial to determine what weight, if any, to give the expert evidence.

Ms. Drevenak's experts stressed early signs of deep knee infection, beginning in March and continuing into the subsequent months. These signs included drainage, redness, swelling, pain and elevated temperature, and Ms. Drevenak's experts maintained that the standard of care, as reflected in scientific publications, required the performance of an aspiration, and follow-up to determine the results of the aspiration. In addition, they opined that prescribing an oral antibiotic would only mask the signs of deep infection that caused the patellar ruptures, and ultimately, the loss of the prosthesis due to the synergistic interaction of two extremely virulent bacterial organisms. Dr. Abendschein's experts disagreed, explaining that symptoms such as redness, drainage and elevated temperature were to be expected in a post-operative patient, and at most, indicated superficial infection. They emphasized the absence of pus until July 1993, and opined that Ms. Drevenak would not have been able to engage in post-operative physical therapy had she suffered from a deep knee infection.[34] They

---

**33.** In weighing the evidence, the trial judge also emphasized that Dr. Abendschein had considerable orthopedic surgical experience, completing approximately 3000 hip and knee replacements. He described Dr. Abendschein as "one if not the doctor who introduced the

concept [of total knee replacement]" at George Washington University Hospital, thirty or more years ago.

**34.** The trial judge credited the testimony of a health care aide who described Ms. Dreve-

attributed Ms. Drevenak's ruptured patellar tendon to trauma, that is, her sudden sitting down on March 26th and her April fall, both of which placed too much stress on her patellar tendon which already had been traumatized by her 1982 surgery, and the knee replacement surgery. In addition, the defense experts relied on a study by Dr. Harris in opining that an aspiration may be counter indicated because of the additional stress it places on the knee, and because its results may be misleading. Since there were no signs of virulent infection before July 1993, in their opinion, and because Ms. Drevenak suffered from other health problems requiring extensive medical attention, an aspiration was not appropriate in the absence of clear signs of deep knee infection, and in light of Dr. Abendschein's visual inspection of Ms. Drevenak's knee when he repaired both ruptures of her patellar tendon. Furthermore, Dr. Abendschein appropriately called in an infectious disease consultant, and both oral and intravenous antibiotics were used appropriately; an oral antibiotic could not have masked the symptoms of a virulent, aggressive deep knee infection.

Clearly, this summary of the experts' testimony reveals that there was disagreement between Ms. Drevenak's experts and those testifying for Dr. Abendschein. The trial court's task, not ours, was to weigh this evidence. In this case the trial judge chose to give greater weight to the experts whose training, board certification in the pertinent medical specialty, and specialized medical experience, appeared to be more extensive, but who also reflected familiarity with and relied on published specialized medical literature.

Based on the record before us, and viewing the evidence in the light most favorable to Ms. Drevenak, *see Wilson, supra,* we agree with Dr. Abendschein; the evidence was sufficient to support the trial court's findings and conclusions with regard to the aspiration of Ms. Drevenak's knee joint. We turn now to the factual issue relating to the presence of a sinus and sinus tract.

*The Factual Error Issue Concerning a Sinus/Sinus Tract*

The trial judge made extensive oral findings of fact and conclusions over a two day period, approximately three and one half months after trial, without benefit of a transcript, but with reliance on his own notes made during trial. Our review of the judge's findings leads us to conclude that, for the most part, they are consistent with the trial testimony and documentary evidence. Nonetheless, Ms. Drevenak asserts that the trial court's "opinion is replete with erroneous findings of fact...." However, she discusses only one alleged factual finding which "she believes was the most material, ... [and] a major basis of the trial court's opinion"; that is, the finding concerning the presence or absence of a sinus tract in Ms. Drevenak's knee, and the definition of "sinus" and "sinus tract." In essence, Ms. Drevenak argues that the trial court erred in making a distinction between a "sinus" and a "sinus tract"; ignored its decision to take judicial notice of the definition of "sinus" found in STEDMAN'S MEDICAL DICTIONARY; and erroneously concluded that a "sinus" is not a "sinus tract." Dr. Abendschein maintains that the trial court's findings regarding a "sinus" and "sinus tract" are not plainly wrong and there was substantial evidence to support the findings. The "sinus" or "sinus tract" issue stems from a March 1993 entry into Ms. Drevenak's medical chart by Dr. Abendschein: "There was a small area of draining sinus in the distal

---

nak's participation in physical therapy after her knee operation.

aspect of the knee which was to be checked at home."

The trial court summarized its findings regarding a "sinus" and "sinus tract" as follows:

> There was also the issue where the plaintiffs indicated that if you have a sinus tract drainage, that gives you a very high percentage of indicia of deep knee infection.
>
> Now, the defense's retort to that and ... I credit the defense ... [is] that if you have a sinus tract, the way to eliminate the sinus tract and this is my understanding of the testimony, the way to eliminate the sinus tract in a patient that has one is it has to be cut out.
>
> Now, there was no denying that there was drainage. That was the other factor There's no denying there was drainage. That point was not disputed by anyone. What the dispute revolved around was this, was that drainage from a sinus tract which meant there was a tunnel or a hole from the inside, from the knee up to the surface or whether there was drainage, but there was no tract. And this wasn't rebutted, as I recall.
>
> The testimony was, the elimination of the sinus tract can only be done by cutting it out. And nobody said that that wasn't the case. All the dispute was about was whether it was a sinus tract or just some drainage more so from the surface.
>
> There's also testimony from the home health care aide that she did have some training. She wasn't a doctor, of course, in viewing wounds and looking at wounds. And she indicated that the drainage that Ms. Drevenak had while she was tending her in the home wasn't anything unusual, wasn't anything different from what she had seen of persons under similar circumstances.[35]
>
> Keeping in mind that she's not a doctor, it only goes toward the issue of whether there was drainage at which they classified a sinus drainage or whether there was in fact a sinus tract along the leg from which fluid was drained. And I find that there was no sinus tract. There was sinus drainage, but it wasn't a sinus tract.

The trial judge singled out the testimony of Dr. Lewis: "He also indicated he didn't believe that the drainage came from a sinus tract as opposed to a sinus or some other opening in the skin, he didn't feel that it was a sinus tract."

The record on appeal shows that neither of Ms. Drevenak's experts, Dr. Smialowicz and Dr. Shall, gave testimony about the definition of a "sinus" or "sinus tract," nor offered an opinion as to whether Ms. Drevenak had a "sinus" or "sinus tract." As the trial judge found, Dr. Lewis, testifying for Dr. Abendschein, declared:

> I am not sure I would characterize it as a sinus tract. Indeed the word "sinus tract" appears a couple of times in the record, and I think it is probably inaccurate. Drainage and a sinus tract are not the same thing. . . . [T]here was some drainage, and that is different from a sinus tract.

On cross-examination, Dr. Mayrer, the infectious disease expert for Dr. Abendschein, agreed that the following statement is more likely than not to be true: "[A] prosthesis exposed at the base of an unhealed surgical wound of the end of a sinus tract is obviously infected." He also said: "A sinus tract, a hole that extends and bores all the way to the base of unhealed surgical wound to the site of a prosthetic device is in fact obviously infected. That

---

**35.** The testimony of the home health care aide   is not in the record on appeal.

is not what [Ms. Drevenak] had." During redirect examination he asserted: "A sinus is just a [railroad] tie, a hole. A tract is something that goes further than just a hole. It's like a little thin column going from point a to point b."

Neither the testimony of Dr. Lewis nor Dr. Mayrer is inconsistent with the definition of "sinus" found in STEDMAN'S MEDICAL DICTIONARY: "Sinus cavity channel hollow, a channel for the passage of blood or lymph without the coats of an ordinary vessel. Two, a hollow in the bone or other tissue. Three, a fistula or tract leading to a separating cavity." Dr. Mayrer summarized the Stedman definition: "The first was channel, the second was h[o]llow or hole, the third is fistula or tract," [36] demonstrating that, in fact, three meanings are set forth in the dictionary. The defense experts appeared to distinguish the first and second Stedman definition from the third, and the trial court accepted that distinction.

Based upon our review of the record on appeal, the trial court's factual findings regarding the absence of a sinus tract in Ms. Drevenak's knee is supported by substantial evidence, specifically, the testimony of Doctors Lewis, Mayrer and Abendschein. In addition, the court's resolution of the issue is not inconsistent with the three meanings of "sinus" found in STEDMAN'S MEDICAL DICTIONARY. Consequently, the court's finding that there was a drain-

ing sinus but not a sinus tract is not plainly wrong.[37]

For the foregoing reasons we affirm the judgment of the trial court.

*So ordered.*

---

**36.** WEBSTER'S NEW WORLD DICTIONARY, SECOND COLLEGE EDITION, defines "fistula" as "1. [] a pipe or tube[;] 2. an abnormal passage from an abscess, cavity, or hollow organ to the skin or to another abscess, cavity, or organ."

**37.** It is not clear from the record why the court took judicial notice of Stedman's definition of "sinus" since the page from STEDMAN'S MEDICAL DICTIONARY which contains the definition apparently was admitted into evidence as Plaintiff's Exhibit No. 52 on March 10, 1998, although the transcript for that date was not included in the record. Furthermore, the definition of "sinus" may not have been appropriate for judicial notice, which has been described as "essentially an expression of common sense" which is applicable to facts that are "well-known by all reasonably intelligent people in the community," or to facts "so easily determinable with certainty from unimpeachable sources, [that] it would not be good sense to require formal proof." *Poulnot v. District of Columbia*, 608 A.2d 134, 141 (D.C.1992) (internal quotations and citations omitted).